In the Matter of the Complaint of IN-LAND TOWING CORPORATION as owner of the TUG CARY K in a cause of exoneration from or limitation of liability, civil and maritime.

Civ. A. No. 6177.

United States District Court
E. D. Virginia,
Norfolk Division.
March 7, 1969.

R. Arthur Jett, Jr., Norfolk, Va., for Inland Towing Corp.

Morton H. Clark, Norfolk, Va., for S. A. Wald & Co.

Robert M. Hughes, III, Norfolk, Va., for S. C. Loveland Co.

T. G. McGovern, Atty., Admiralty and Shipping Section, Dept. of Justice, Washington, D. C., and U. S. Atty., Norfolk, Va., William T. Mason, Jr., Asst. U. S. Atty., for United States.

## MEMORANDUM OPINION

KELLAM, District Judge.

This action arose out of the grounding and sinking of a barge in the Intracoastal Waterway in the Coosaw River, approximately one mile east of Brickyard Point, near Beaufort, South Carolina, in the early morning hours of October 30, 1966.

### PARTIES AND CLAIMS

A. Inland Towing Corporation (Inland) seeks exoneration from or limitation of liability for damages resulting from the sinking of the Barge LOVELAND 3, and the loss of her cargo of raw bulk sugar while being towed by its tug, CARY K, in the Intracoastal Waterway in the vicinity of Brickyard Point, South Carolina.

B. Claims were filed against Inland by (1) S. C. Loveland Co., Inc. (Loveland) as owner of the Barge LOVELAND 3 (Barge), and as bailee of its cargo; and (2) S. A Wald & Co., Inc. (Wald) as owner of the cargo of sugar, each asserting improper manning and operation of the CARY K.

C. The United States of America (United States) was joined as a third-party defendant with liability attributed to failure to maintain and properly mark the channel.

D. Cross-claims were filed by (1) Wald against Loveland claiming LOVELAND 3 was overloaded, unseaworthy, and her owners were negligent; (2) Loveland against Wald for payment of freight and agreed special charges; and (3) the United States against Loveland claiming the Barge was unseaworthy, uninspected and overloaded.

E. Counter-claims were filed by (1) Inland against Loveland asserting unseaworthiness of the Barge and negligence of the personnel of Loveland, and (2) Inland against Wald for improper cargo and improper supervision of loading the Barge.

## BARGE "LOVELAND 3"

The Barge is 195 feet long, 35 feet wide, 11 feet deep from its flat bottom to the deck, the sides and bottom were of ⅜ inch steel plates, and it had a single cargo compartment, separated from the sides and bottom hull plating, one foot above the latter. This was covered by rolling steel hatches supported by a coaming, set back from the sides and ends of the hull, and rising 16 inches above the deck. The hatch was weatherproof, but not watertight. The hull (outside the cargo hopper) consisted of six compartments separated by watertight athwartship bulkheads, a rake (slanted) bow, a square stern and four intermediate compartments. None of the compartments had a centerline bulkhead. The bow and stern compartments extended the width of the Barge. The intermediate compartments were adjacent to the cargo compartment on both sides and extended under it in the form of a "U". Sounding pipes permitted checking water in the compartments without opening the hatches, or they could be sounded or entered through manholes located on deck. At each corner of the stern there were steel bands six inches wide and four feet long. The tops of the upper bands were 12 inches below deck level; the lower bands were six inches below the upper ones. The Barge was not subject to Coast Guard inspection, but she was classified with the American Bureau of Shipping for inland waters. No loadline marking is required for an inland barge.

Earlier in October 1966, the Barge had been loaded with approximately 1500 tons of damaged raw sugar at Philadelphia, removed from an ocean going vessel. Wald had obtained the services of the Barge for a temporary storage of the sugar. Thereafter Wald sold the sugar to a Savannah, Georgia, customer, to be delivered in Savannah.

The Barge had made previous voyages through the Intracoastal Waterway with loads of approximately 1500 tons, a draft of about ten feet and a freeboard of about 12 inches. The evidence established that it is not unusual to tow a barge drawing ten feet through the inland waterways. Likewise, the evidence established that it would be unusual for a barge drawing ten feet of water to travel from Norfolk to Savannah without grounding during the voyage. No damage would result if grounding occurred on a soft bottom. Along the route, currents at inlets often build shoals of mud or sand, but they do not extend all the way across the channel. Tug operators are familiar with these situations and are expected to maneuver to avoid them. A bulletin issued by the United States Army Engineers advised that the controlling depth of water in the area of the casualty was 11.5 feet.

## CONTRACT OF TOWAGE

Loveland agreed with Wald to tow the Barge to Savannah for a lump sum of $7,000.00, and Wald would make its own arrangements about insurance. The carriage would be pursuant to a tariff or short notice permission from the I.C.C., Wald to pay one-half of the cost of obtaining same, to pay the cost of unloading the sugar, and the cost of having a crane level the cargo in the Barge so that the Barge would be "on her feet." The tariff as issued contained a provision that the cargo of sugar was deemed to have a value of $25,000.00, unless a different value was declared in the bill of lading. No greater value was declared in the bill of lading. Wald received copy of the tariff provisions on October 14 or 15, 1966, which was after the Barge left Philadelphia. Copy of the bill of lading was mailed to Wald on October 14th, but Wald did not receive it until after the sinking.

Loveland contracted with R. K. Davis for the services of a tug to tow the

Barge to Norfolk, and with Inland for the tow from Norfolk to Savannah.

## THE TOW

Prior to commencement of the trip, the services of a crane were obtained to level the cargo of raw sugar, to put the Barge on even keel. Prior thereto, there was a list to the port side. After the leveling action, there was still a list and a slight drag. It was testified a six inch drag was desirable. When the Barge was picked up in Philadelphia, the tug captain noted it to be slightly lower in the stern than in her bow, with a drag of about eight inches. He also noted a slight port list with the after port corner having a draft of about ten feet three or four inches and the after starboard corner a draft of about ten feet. This resulted in a freeboard of seven or eight inches at the after port corner. The journey down the open water of Chesapeake Bay was uneventful with good weather and very little sea. Approaching Norfolk, the captain noted that the port list of the LOVELAND 3 had increased from three or four inches to about six or eight inches. He went alongside the Barge at Hampton Roads and opened the after hatch in an attempt to discover a reason for the increased list. An accumulation of melted sugar was found in the after port corner and an attempt was made with an auxiliary pump from the tug to remove this. The thickness of the cargo prevented this from being done.

The Barge was delivered to Norfolk and there picked up by Inland, with the Tug CARY K. This tug was powered by a 400 horsepower diesel engine, capable of moving the loaded Barge at about three miles per hour in slack water. There were no engine controls in the pilothouse, thus it was necessary for the engineer on watch to make indicated changes in speed or direction in the engine room.

Captain Norris Wooten was the sole stockholder of Inland and was its President and Chief Executive Officer, and Master of the Tug CARY K.

The CARY K picked up the Barge at Norfolk and commenced the towage at 0530 EDST on October 19, 1966. At the commencement, tug personnel noted that the Barge had a port list, drawing about ten feet, with a freeboard of ten or eleven inches at the low corner at the after port side; a very small quantity of water was pumped from the cargo hold. Captain Wooten telephoned Loveland's office from Great Bridge, to report this list in the Barge since he had been advised the Barge was level. At 0100 on October 20, 1966, the flotilla anchored because of high wind. In the vicinity of Albemarle Sound, rougher weather was encountered. The draft and list of the Barge increased to the point that the after port deck was awash. In an attempt to decrease the list, Captain Wooten pumped some water into the side tanks of the Barge. Loveland was advised of the situation and action that was being taken. He informed Captain Wooten that adding water to the double bottoms would not correct the list because there was no centerline bulkhead. Any water so added would run to the low side, increasing the list. Approval was given by Loveland to the suggestion of Captain Wooten that the Barge be beached on a sandy shoal to facilitate wet cargo running to starboard, and to pump the tanks. On this occasion, some liquid cargo was pumped overboard. This action decreased the list and draft of the Barge. It then drew approximately ten feet seven inches at the after port corner (7 or 8 inches freeboard) and about nine feet six or eight inches at the after starboard corner. This was considered a safe condition to proceed. The Barge grounded on a number of occasions between October 22 and October 30. With the exception of the final stranding, however, all groundings were of relatively short duration, apparently where the bottom was soft as a result of shoaling action, with the Barge being freed either by use of the tug's engine or the advent of higher water. The Barge was sounded after each grounding; no water was found in any tanks.

Because of the reported problems with the draft, listing of the Barge and slow progress, Loveland dispatched Joseph Malinowski, maintenance man, to join the tug and Barge at Morehead City, North Carolina. Malinowski was to assist in keeping the Barge level, and to pump the cargo if it developed liquidity. At Morehead City, the trim was about the same as it had been; the after port corner was something over ten feet with four or five inches of freeboard.

At McClellansville, the Barge was again put on a shoal with her port side higher, so that the melted sugar ran to starboard. Following this operation, the Barge had and maintained a draft at the after port corner of about ten feet three inches until her final stranding. Captain Wooten felt he had the Barge in good shape to continue her voyage. The draft and trim could easily be checked by the man in the wheel house of the tug by means of the metal bands at the after corners one foot below deck level. Malinowski periodically checked the cargo and double bottom tanks. The cargo was somewhat leveled and soupy. There was no water in the cargo box or double bottom. This condition was confirmed by inspection before nightfall on October 29. At 0000 and at 0450 on October 30, the trim and draft of the Barge was unchanged. This was constantly checked by the welded bands at the Barge stern, showing about six to nine inches freeboard at the after port corner. The list never affected the handling of the Barge in any way. It was making 2 to 2½ miles per hour. The Barge grounded briefly on soft bottom without sensation of lurch or impact, about 0400 on October 30, at what appeared to be mid-channel between markers 200 and 201. It was soon afloat again.

## GROUNDING AND SINKING

At 0500 on October 30, 1966, the Barge stranded and did not come free, despite efforts by the tug. It was then almost slack low water, approaching daybreak and visibility was good. The flo-tilla was southbound in the Coosaw River, slightly less than a mile east of Brickyard Point, South Carolina, and southeast of day beacon 206. In anticipation of coming on watch at 0600, Captain Wooten came into the pilothouse at 0530 and saw the stranded Barge. At that time the after port corner of the Barge was drawing about ten feet three inches, with about eight inches of freeboard.

Malinowski checked the cargo compartment and starboard double bottom tanks and found no water. The water rose on the Barge with the tide and eventually covered the coaming and commenced flooding the cargo compartment. Finally only the after starboard corner of the deck and part of the hatch were out of water. As water accumulated in the bow tank, the bow went down and the stern up. The Barge then twisted slightly and came to rest at a slight angle across the channel.

At the point where the Barge sank the chart (Inland Exhibit No. 1) indicated a marked channel of about 90 feet width. Parallel to and just north of this channel there existed a rock ledge about 45 feet from the correct center line of the channel and the Barge was resting on this ledge of hard phosphate rock covered with individual rocks up to 24 inches in diameter. Soundings taken by Malinowski following the grounding to measure the depth of water around the deck of the Barge showed readings of seven to eight feet.

The Annual U. S. Army Engineers Information Bulletin lists a controlling depth of eleven feet six inches in the Brickyard Creek section of the Intracoastal Waterway, where the grounding occurred (Government-Loveland Exhibit 2). This was based on a profile made by the Army Engineers in mid-October 1966.

The center of the channel from approximately flashing buoy 203 to approximately range 202 is a straight line. The center of the channel is determined by lining up the front and back lights of range 202. When the front and back lights of range 202 are in line, you are

in the middle of the channel as shown on the nautical charts of the Intracoastal Waterway.

In August 1965, the Coast Guard (charged with the maintenance of the aids to navigation in the Waterway) discovered that the front range light at range 202, Brickyard Point, was missing. The Coast Guard Cutter AZALEA undertook to rebuild the front range. It determined the point for rebuilding by taking visual compass bearings on the after range and on other beacons in the area. The Commandant of the Seventh Coast Guard District had directed the captain of the AZALEA to postpone rebuilding the range until the Army Engineers could make proper surveys and flag the range line. However, the captain of the AZALEA elected to position and rebuild the range. The forward range was incorrectly positioned five feet to the north of its proper location. At the time of this rebuilding, the captain of the AZALEA said his gyrocompass, normally used to position aids to navigation, and which was more accurate than the peloruses, was not operating, and he positioned the front range light as best he could. Hence, a navigator on the range line, as rebuilt, was some twenty-two feet to the north of the correct center line of the channel, at the point where the sinking occurred.

At most any other location in the Intracoastal Waterway, the improper location of this navigation aid would have been of little consequence because most of the bottom of the Waterway is soft mud. But, at the place of the sinking, the bottom beyond the edge of the channel was rocky and there were large rocks or boulders there. The greater damage to the bottom plates of the Barge was on the starboard side. They were of such size that it was testified that flooding from the holes in the hull would have caused the Barge to have sunk within five or ten minutes.

▮▮▮▮ There is nothing in the evidence to indicate the manner of loading or the list of the Barge contributed to the sinking. It had proceeded for quite

some time and distance without a change in draft. The sinking was caused by the holes in the bottom. Hence, the loading or seaworthiness of the Barge did not contribute to the casualty. If "unseaworthiness [is] not the [a] proximate cause of the loss, it is contended the vessel [Barge], may [not] be charged with the damages." May v. Hamburg, etc., 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348; Interlake Iron Corp. v. Gartland S. S. Co., 121 F.2d 267, 270 (6th Cir. 1941). And while there may be some evidence the Barge "was unseaworthy at the commencement of the voyage, this condition was not a concurring or contributory proximate cause of her fate." Curtis Bay Towing Co. v. Southern Lighterage Corp., 200 F.2d 33, 35 (4th Cir. 1952).

The operator of the tug (pushing the Barge) testified he was on range at time of grounding. Each person on the Barge, who saw the position of the tug and Barge, either at time of or immediately after grounding, gave the same testimony. There is no credible evidence to the contrary. At most places in the Intracoastal Waterway, near where the grounding occurred, the Barge could have been off course without danger. At the point of grounding, the depth of water in the channel, as compared with the depth just out of the channel, changes substantially—from eleven feet eight inches at the edge of the channel to eight feet three inches just north of the northern channel line. (See Inland Exhibit 5).

In situations such as here, the law applicable is stated in Curtis Bay Towing v. Southern Lighterage Corp., 200 F.2d 33, 34 (4th Cir. 1952):

The law governing such situations is well settled. In a contract of towage, the owner of the tow is responsible for the seaworthiness of his vessel and the owner of the tug for its safe navigation. The Radnor, D.C.Md., 21 F.2d 982; The Lizzie M. Walker, 4 Cir., 3 F.2d 921. The owner of the tug is not an insurer against whom the mere loss of the tow raises a presumption of fault, Stevens v. The White

City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; The Lapwing, 5 Cir., 150 F.2d 214; but he is obligated to perform his duties with such reasonable care and maritime skill as prudent navigators usually employ in similar undertakings, and with such consideration as special circumstances may require. The Admiral, 5 Cir., 84 F.2d 616; The Director, 4 Cir., 21 F.2d 47; The Morning Star, D.C.S.D.N.Y., 10 F.2d 538.

■■ The tug is not an insurer and the burden of proving negligence on it is upon the tow. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; The Anaconda, 164 F.2d 224, 228 (4th Cir. 1947). The condition of the load and the list of the Barge were "not so obviously unfit for towing as to put the tug captain on notice that it would be negligent to proceed with the tow." Shamrock Towing Co. v. Schiavone-Bonomo Corp., 275 F.2d 338, 341 (2d Cir. 1960). Wald did the loading of the Barge, and Loveland had notice of the stability of the Barge.

"To navigate a channel by use of range lights it is not necessary that the vessel be exactly in line with them." Canada S.S. Lines v. Great Lakes Dredge & Dock Co., 81 F.2d 100, 103 (7th Cir. 1936).

■■ While it is usually necessary to prove the government had either actual or constructive notice of the fact a channel marker was not in place, in order to sustain a claim of negligence, Russell, Poling & Co. v. Conners Standard Marine Corp., 252 F.2d 167, 170 (2d Cir. 1958), where the government has created the negligent act such notice would be presumed. As was said by the United States Supreme Court, "it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." Indian Towing Co. v. United States, 350 U.S. 61, 64, 76 S.Ct. 122, 124, 100 L.Ed. 48. Continuing with the opinion in the last·

cited case, at page 69 [350 U.S. 61, 69, 76 S.Ct. 122, 127] the Court said:

The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

What was said in Chesapeake and Ohio Railway Co. v. United States, 1966 A.M.C. 1883, 1884 (E.D.Michigan, 1962), is also applicable here, namely:

Since the men of the Coast Guard stationed at the south pierhead light were charged with the responsibility of keeping a close watch on the aid to navigation marking the Kewaunee Shoal, and by the simple expedient of taking ranges with a suitable instrument they could have detected any substantial movement of the buoy to the north or south, which they failed to do, the Coast Guard must be held to have had constructive knowledge of the movement of the buoy.

The failure of the Coast Guard to advise the Captain of the PERE MARQUETTE 22 that the buoy was off its advertised station was a proximate cause of the damage sustained by the PERE MARQUETTE 22.

■ Once the Coast Guard learned the channel marker in question had been removed, and determined to replace it, without properly determining where to rebuild it, the government becomes liable "for negligence in marking after the discretion has been exercised and the decision to mark [re-mark] has been made." Somerset Seafood Co. v. United

States, 193 F.2d 631, 635 (4th Cir. 1951). It certainly has not performed its duty when it relocates the light at such a location as to "constitute a trap" for those using the channel. Somerset Seafood Co. v. United States, supra.

The evidence establishes that the only proximate cause of the casualty in this case was the negligence of the government in rebuilding the channel marker light. Hence, we need not reach the issue of the right of Inland to a limitation of liability.