**UNIVERSE TANKSHIPS, INC. as owner of the ORE SATURN**

v.

**UNITED STATES of America**

v.

**Duval H. EVANS.**

**Civ. A. No. 251 of 1965.**

United States District Court,
E. D. Pennsylvania.

Jan. 7, 1972.

Richard Palmer, Philadelphia, for plaintiff.

Harold Wilson, Trial Atty., U. S. Dept. of Justice, Admiralty Div., Washington, D. C., Benjamin Stahl, Jr., Philadelphia, for defendants.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

TROUTMAN, District Judge.

### The Parties and Contentions

On February 10, 1964, the SS ORE SATURN, owned by the Universe Tankships, Inc., a corporation of the Republic of Liberia, ran aground in the upper Delaware River while transporting ore to the Fairless plant of the United States Steel Company located at Morrisville, Pennsylvania. This suit is brought against the United States under and pursuant to the Suits in Admiralty Act, 46 U.S.C. § 741. The Government, pursuant to former Supreme Court Admiralty Rule 56, impleaded the ORE SATURN'S pilot, Duval H. Evans.

Having off-loaded a portion of her cargo at Pier 22, Philadelphia, Pennsylvania, the ORE SATURN proceeded up river proceeding through dredged channels which had undergone significant changes and realignment during the years 1962 through 1964. The Coast Guard had primary responsibility for aids to navigation and the location thereof and had, with certain exceptions, assigned the ZINNIA to continuous duty on the project.

The libellant and Pilot Evans contend that the grounding was the result of the negligence of the Coast Guard in that buoy 26 was, admittedly, not on its charted position on February 10, 1964. They contend that because of sudden and unexpected reduced visibility they were obliged to rely upon said buoy in negotiating the turn from Mud Island Range into Enterprise Range; that buoy 26 was intended to mark the turn into Enterprise Range; that it was 230 yards below (down river) its charted position and that the ORE SATURN accordingly grounded a shiplength (751 feet) upstream of buoy 26 in the Enterprise Range.

On the contrary, the Government contends that the grounding was the result of the negligence of the pilot, the master and the crew of the ORE SATURN in leaving Pier 22 under the weather conditions existing on the morning in question; in negligently navigating the ORE SATURN, and in failing to recognize that buoy 26 was not on its charted position. Finally, the Government contends that it had no notice, actual or constructive, that buoy 26 was off its charted position on February 10, 1964, and that the libel should accordingly be dismissed.

The case was ably tried by experienced counsel who have submitted complete briefs together with requests for findings of fact and conclusions of law. Extended testimony was taken and other evidence submitted. It has been carefully reviewed. It contains an unusual and extraordinary number of inconsistencies, contradictions and conflicts. For example, it involves obvious erasures of records resulting in conflicting testimony of handwriting experts; it involves conflicting evidence as to the identity and location of a certain object used in fixing the position of buoy 26 and involves the question whether a given object, used

in fixing the position of buoy 26, in fact existed on a given date and occasion. Seldom, in a case of this kind, does the record involve so many and such substantial conflicts of evidence. We have devoted an extraordinary amount of time and effort to a consideration of the extended record and on the basis thereof, make the following:

## FINDINGS OF FACT

*As to the Parties and the Grounding*

1. At all material times herein, the SS ORE SATURN was owned by Universe Tankships, Inc., a foreign business corporation organized and existing under the laws of the Republic of Liberia, and is a bulk ore carrier, 751 feet in length, 102 feet in beam, single screw with a fresh water loaded draft of 39 feet 03 inches.

2. The United States of America is a corporation sovereign which has consented to be sued herein under the Suits in Admiralty Act, 46 U.S.C. § 742 and following.

3. Pilotage in the Delaware River for vessels of foreign registry inbound from foreign ports is governed by State law and is "compulsory". 23 Del. Code § 121; 55 Purdon § 172.

4. On February 10, 1964, the ORE SATURN grounded a ship-length upstream of buoy 26 and outside the channel in Enterprise Range in the Upper Delaware River while in transit from Pier 122 South, Philadelphia, to the Fairless Steel Works, Morrisville, Pennsylvania.

5. The actual channel alignment and aids to navigation in the Upper Delaware River were physically located on February 10, 1964, as shown on the 15th Edition of Coast and Geodetic Survey Chart No. 296. Buoy 26, however, after the grounding, was found 230 yards, bearing 234° true from its intended position at the turn from Mud Island to Enterprise Range as shown on the 15th Edition of the Chart.

6. By agreement of the parties, the issue of damages was severed from liability.

*As to the Negligence of the Coast Guard*

7. At all material times herein, the work of establishing and maintaining buoyage in the Upper Delaware River was the responsibility of the United States Coast Guard. This work was assigned the Coast Guard buoy tenders ZINNIA and LILAC.

8. The proper maintenance of buoy 26 was the primary responsibility of the buoy tender ZINNIA.

9. Separate operational records were maintained by each of the Coast Guard buoy tenders in the regular course of their business of servicing buoys in the Upper Delaware.

A quartermaster's log book and a buoy card Form 2555 and Form 3738 were maintained. The quartermaster's log book and buoy card were the only contemporaneous records of servicing.

10. Coast Guard regulations required that entries be made in the quartermaster's log books whenever a buoy was serviced.

11. A buoy card was maintained on the bridge of the buoy tender for each buoy and each servicing was recorded on the card.

12. A Form 2555 was and is required to be prepared and executed whenever a buoy was moved. The position in which a buoy was placed in terms of objects and sextant angles used in positioning the buoy, or by range and bearing from specified named objects was required to be recorded on the form.

13. Form 3738 is a summary of all work performed by the tenders and was required to be prepared and filed at 15-day intervals.

14. Form 2555 was prepared in draft form by a quartermaster on the buoy tender as each job was being done. Shortly thereafter, a yeoman prepared a final typed version for approval by the

commanding officer of the tender and the pencil draft was destroyed. After the typed form was reviewed, approved and signed by the tender's commanding officer, the form was submitted to the Headquarters of the Coast Guard Third District at New York.

Instructions for Form 2555, on the reverse side, require:

"1. This report is required in order to reflect the work performed under items listed in ACTION TAKEN column which, if it were not submitted, would make the latest Forms CG–2555, CG–3465, or CG–3466 obsolete with regard to the data recorded.

"2. For all conditions except NORMAL, state reason so far as it is known.

"3. All data shall be filled in on this form when work is performed on items marked by asterisks (*) in ACTION TAKEN column. Only data related to the work accomplished need be given for other items in this column when of minor nature.

"4. The chart number shall always be recorded. Enter the latitude and longitude only when necessary, such as for offshore buoys or for buoys whose position cannot be precisely located by sextant angles or visual bearings.

"5. The position of a buoy shall be determined by observations of the aid, at the time the work is being done, by sextant angles and/or bearings on fixed objects readily identified on the chart, when possible. When such methods are not feasible, obtain position by utilizing radio aids to navigation, radar, loran, soundings, or, if necessary, by dead reckoning. When such methods are used, record complete data under REMARKS.

"6. Depth of water shall be obtained by soundings taken at time buoy is set, correct to datum of chart used.

"7. Details regarding causes of any deficiency of operation or position of an aid to navigation shall be given under REMARKS.

"8. The report shall be signed by the person who actually performs the work. When the commanding officer has personally supervised the work, only his single signature is necessary.

"9. The following definitions describe the terms used in ACTION TAKEN column:

ESTABLISHED. Placed in authorized operation. Aid to be added to light list.

COMMISSIONED. An aid previously reported "Closed" or "Withdrawn" has been placed in operation.

REPLACED. An aid reported "Off Station", "Adrift", and/or "Missing" has been replaced by another of the same type and characteristic to permit overhaul and servicing.

RELIEVED. Replacement of an aid by one of the same type and characteristic to permit overhaul and servicing.

RELOCATED. Authorized change of station location in immediate vicinity. Light list to be changed accordingly. If temporary relocation, give reasons and authority under REMARKS.

RELIGHTED. An aid reported extinguished has been relighted.

RESET. A floating aid reported "Off Station", "Adrift", or "Missing", has been returned to station.

SERVICED. Regular maintenance work performed such as checking position and condition, inspecting, recharging, painting, cleaning, etc., without changing location or light list description. Actual work performed shall be listed under remarks."

The Third District Operations Plan required:

"(4) Form CG–2555, "Report on Aid to Navigation" shall be submitted each time an aid is:

(a) Established, relieved, or relocated.

(b) When the characteristic or any feature of the aid as listed in the current light list is changed.

(c) When any significant change is made in any component or power supply of an aid.

(d) When any discrepancy in the *position* of an aid is corrected.

It is essential that accurate sextant angles be included, or if not available, true bearings of charted fixed objects or the most precise fix otherwise obtainable. Only those items which are changed need be indicated on this form, except that position information shall be included every time that the report is submitted for reasons in (a) or (d) above. When work is performed on an aid assigned to another unit, that unit shall be furnished a copy of the report."

15. The angles used to position each buoy appearing on Form 2555 were plotted at Third District Headquarters to verify that the buoys were properly placed in their intended positions. Copies were maintained in the tender's files for reference.

16. Instructions of the quartermaster's log book (found inside the front cover of each log) stated in part:

"INSTRUCTIONS FOR KEEPING
THE LOG

\*   \*   \*   \*   \*   \*

"Entries

\*   \*   \*   \*   \*   \*

"13. Any change in the log shall be made by drawing a single line through the part of the log it is desired to change; no erasures will be permitted. Any change or addition shall be made at the bottom of the page over the signature of the person making the change.

\*   \*   \*   \*   \*   \*

"ENTRIES SHALL BE MADE IN
THE LOG CONCERNING THE
FOLLOWING WHERE APPLI-
CABLE

\*   \*   \*   \*   \*   \*

ACTIVITIES OF THE UNIT
"\*   \*   \*   \*   \*   \*

"25. Buoys lost or recovered, report of.

\*   \*   \*   \*   \*   \*

"26. Buoys serviced, showing name and number of buoy and page of light list."

\*   \*   \*   \*   \*   \*

17. As a result of the upriver project to widen and deepen the channel from Philadelphia to Morrisville, it became necessary to relieve and replace old nun buoy N–26 with a lighted radar reflector type buoy designated as R–26. R–26 was to be placed at the turn between Mud Island and Enterprise Range.

The United States Army Corps of Engineers authorized a position for buoy 26 1880 yards, 222.5° true from Stack Echo Beach.

18. In order to position R–26, the Coast Guard buoy tenders plotted the buoy's intended position from ranges and bearings furnished them by Headquarters Third Coast Guard District on the currently available edition of Chart 296 for the Upper Delaware, the 14th Edition. A three-armed protractor was then placed on the chart with the buoy's intended position at the center of the protractor and the three arms of the protractor in line with three objects chosen for actual sighting when positioning the buoy in the river.

19. Once the objects and angles between objects were determined, it was essential that all objects taken from the chart be properly identified visually during the actual positioning in order to correctly place the buoy in its intended position.

20. The ZINNIA attempted to position buoy 26 on its intended position at the turn from Mud Island to Enterprise Range on May 23, 1963. However, the position in which the buoy was located by the ZINNIA on May 23 did not mark the turn between Mud Island and Enterprise Range. The commanding officer of the ZINNIA, Mr. Patrick, reported in part on Form 2555:

". . . Buoy is intended mark intersection of Mud Island and Enterprise Range. It is approximately 1000 feet past the intersection on Enterprise.

Mr. Cable of the Corps of Engineers will make recommendations as to the best location."

21. On June 4, 1963, the United States Army Corps of Engineers authorized a second position for buoy 26, 2390 yards, 227° true from Stack Echo Beach. The Coast Guard buoy tender LILAC attempted to relocate buoy 26 on June 4, 1963, in accordance with the Engineers' June 4 position. The navigators on the LILAC positioned the buoy by the use of sextant angles, sighting on (1) Old Torresdale rear light, (2) East Tower, Bridgeboro, and (3) the stack at Echo Beach, as specifically reported on Form 2555 dated June 4, 1963, approved and signed by Commander Hanson, Commanding Officer of the LILAC.

22. At the trial, the LILAC'S Commanding Officer, Cdr. Hanson, identified the tower on the left or west bank of Rancocas Creek as the East Tower used to position buoy 26.

It was established and we find that if the "East Tower" at Bridgeboro were the tower on the right or east bank of the creek (as you face the chart), the buoy would be mispositioned. But if the West tower on the left bank (as you face the chart) were used, the buoy could be correctly positioned.

23. Because those in charge of the LILAC erroneously and negligently misidentified the East Tower Bridgeboro in positioning buoy 26, the buoy was misplaced 25 yards west and 25 yards out of the channel toward the New Jersey edge.

24. On July 18, 1963 the ZINNIA again attended buoy 26 but failed to correct the off-station position of the buoy. The buoy was not moved or reset at this time; no 2555 was prepared and executed.

25. On August 6, 1963 the ZINNIA again attended buoy 26 and the buoy was found off-station on that date. Buoy 26 was reset but not on its intended position marking the turn from Mud Island to Enterprise Range. The buoy was reset on August 6, by sighting with sextants, using what was thought to be the Old Torresdale range rear light as one of the three objects. However, by the middle of July 1963 the Old Torresdale range rear light was no longer standing.

26. Had the ZINNIA used the new Torresdale range rear light to position buoy 26 the buoy would not be set in its intended position to mark the turn from Mud Island to Enterprise Range. No other range light was in position at Torresdale on August 6. Had the Old Torresdale range light been actually standing on August 6 and had it been used to position buoy 26, the buoy would have been placed in its intended position at the turn.

27. The ZINNIA'S Commanding Officer and navigators did not know that the Old Torresdale range rear light was no longer in existence on August 6, 1963; there is no evidence to show they knew this fact although by July 3 they should have been aware of the change in range lights. The change was announced in Local U.S. Coast Guard Notice to Mariners No. 37 dated July 3, 1963. The change was also announced in Washington Notice to Mariners No. 31 of 1963 dated August 3, 1963.

28. The chart in use on the ZINNIA on August 6, 1963, was the 14th Edition of Chart No. 296, published in September 1962 but corrected only through Notice to Mariners No. 30 of 1963. We find that the Torresdale range light actually standing was mistaken to be the Old Torresdale range light which in fact had been removed in mid-July.

29. The ZINNIA attended buoy 26 on September 3 and 4, October 2 and November 26, 1963, and January 15 and 17, 1964, but failed to determine that buoy 26 was not in its intended position at the turn between Mud Island and Enterprise Range on the foregoing occasions.

30. The ZINNIA attended, checked and allegedly found buoy 26 on station on January 17, 1964; that is the last claimed servicing prior to the grounding

on the ORE SATURN on February 10, 1964.

31. The buoy card for buoy 26 shows admitted substantial erasures and alterations for the servicing entry made on January 17, 1964. The quartermaster's log book also admittedly shows substantial erasures and alterations. The FBI report also confirmed erasures and alterations.

32. Buoy 26 remained off station from May 23, 1963, through February 12, 1964, notwithstanding that the buoy was moved by the Coast Guard on June 4 and August 6, 1963.

33. There was no appreciable amount of ice in the Upper Delaware River during 1963 and 1964 and buoy 26 was not moved by ice during the winter of 1963–1964 prior to the grounding.

34. On February 10, 1964, the day of the grounding, buoy 26 was found off station 230 yards bearing 234° true from its intended position marking the turn from Mud Island to Enterprise Range. Its position was about 35 yards from the spot charted for it on the old 14th Edition of chart 296, which was currently in use. The 15th Edition Chart was not published until September, 1964.

35. On February 12, 1964, buoy 26 was found off station in the same position, i. e., 230 yards bearing 234° true from its intended position marking the turn from Mud Island to Enterprise Range; close to the buoy's charted position before May 23, 1963, as shown on the old 14th Edition Chart which was currently in use.

36. On February 12, 1964, the HICKORY properly reset buoy 26 on its intended position marking the turn from Mud Island to Enterprise Range.

37. Buoy 26 was mispositioned because of the negligence of Coast Guard personnel in failing properly to identify the necessary shore objects as well as to identify such objects on the chart in positioning of buoy 26.

38. Attendance at buoy 26 by Coast Guard buoy tenders on June 4, August 6, September 3 and 4, October 2 and November 26, 1963, and January 15 and 17, 1964, afforded the Coast Guard ample opportunity to ascertain that the buoy was off station, but the Coast Guard was negligent in failing to determine at any time prior to February 10 that buoy 26 was not, in fact, on its intended position.

39. The negligence of the Coast Guard in positioning buoy 26 as well as its failure to detect its off station position are the sole substantial causes of the grounding of the ORE SATURN.

40. The United States negligently mispositioned buoy 26 and failed to detect its off station position on several occasions and is, therefore, solely liable for damage sustained by the ORE SATURN on February 10, 1964.

### DISCUSSION

In reaching the foregoing findings of fact we have had to resolve wide and difficult conflicts, contradictions and inconsistencies in the testimony and evidence. That buoy 26 was off its charted position on May 23, 1963, is admitted. On June 4, 1963, it was positioned using, inter alia, the "East" tower at Bridgeboro. From the record we have been obliged to find that the "West" tower at Bridgeboro was in fact used. The Court saw the maps locating the "east" and "west" towers, heard the extended testimony seeking to explain the circumstances, noted that at least one Government witness refused to accept the Government's explanation, and found itself compelled to conclude that buoy 26 was misplaced on June 4, 1963. A realistic appraisal of the evidence can lead to no other conclusion.

Again, on August 6, 1963, the buoy was found off its charted position and this in spite of the fact that at least one intervening inspection on July 18, 1963, did not disclose an off station position. Again, on August 6, 1963, an unusual circumstance developed in that the "Old Torresdale" range light was to have been used, along with two other objects, in fixing the charted position of the buoy, and the Government witnesses admitted

that the "Old Torresdale" range light was, in accordance with instructions, used in fixing the position of buoy 26. However, the uncontradicted testimony of a disinterested witness, whose credibility was not attacked, established that said "Old Torresdale" range light had been dismantled and removed prior to August 6, 1963. Thus, the buoy was, by mistake, not placed in its proper position on August 3, 1963. Its position was not again changed prior to the grounding on February 10, 1964. True, it was "attended" in the meantime, but its location was not changed by the Coast Guard and there is no evidence of excessive ice during the winter of 1963–1964 such as would drag it off its position. The evidence is quite to the contrary. Moreover, there is no evidence that it was dragged off position by another vessel. Therefore, we have been obliged to reach the rather difficult conclusions, above expressed and to reluctantly impose upon the Government liability for this unfortunate incident. Afran Transport Co. v. United States, 309 F.Supp. 650 (S.D. N.Y.1969); Kommanvittselskapet Harwi v. United States (3rd Cir. 1971); Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Inland Towing Corporation, 307 F.Supp. 874 (E.D.Va.1969).

The Government contends that Pilot Evans, the master and the crew were separately or collectively negligent in leaving Pier 122 under the weather conditions then existing and as forecasted and that the vessel was thereafter negligently navigated. The case was well tried and on the basis of the evidence, we make the following *additional* Findings of Fact as to

*The Navigation of the Vessel and the Negligence of the Pilot, Master and Crew*

41. On February 9, 1964, the ORE SATURN, inbound from Port Cartier, Canada, with a load of iron ore, docked on the north side of Pier 122 South, Philadelphia. The vessel discharged part of her cargo of iron ore at Pier 122 South during the early morning of February 10 to lighten her for the final portion of her voyage upriver to the Fairless Works at Morrisville.

42. The lightening operation was completed at 0745 on February 10, 1964, and at 0745 the chief officer went onto the dock and visually observed that the vessel's draft was 32 feet 6 inches forward and aft in fresh water which he reported to the master. The most accurate means of determining draft is by visual observation of draft marks.

43. At about 0745 snow and fog reduced visibility at Pier 122 South to approximately ¼ mile.

The master arrived on the vessel at about 0800, and observed snow and reduced visibility in the vicinity of the pier. The ORE SATURN, which was to have sailed from Pier 122 South for Morrisville at 0800 was scheduled to depart at 0900.

44. Shortly after 0800, the mate on watch commenced testing the vessel's navigation gear including her whistle, lights, steering gear and engine telegraph, telephone and navigation lights in preparation for the upriver transit. He switched on the vessel's radar machine at this time. He confirmed that all navigation gear was in good operating condition.

45. The vessel's radar machine, Raytheon Model 1450, was a 10 centimeter relative motion set with variable range settings of ½, 1, 2, 4, 8, 20 and 40 miles, equipped with a heading flasher, variable range ring and bearing cursor. At all material times during the upriver transit, the radar was set on the 2-mile range. The radar was a good accurate machine and was in good operating condition.

46. The master was advised by shore personnel at Pier 122 that the weather was clear at Morrisville to the Burlington Bristol Bridge. Captain Ekholm obtained this information before boarding the vessel at 0800.

47. The pilot of the ORE SATURN, Captain Evans, reported aboard at 0900, observing light intermittent snow and

visibility which had increased to 1½ to 2 miles.

48. Before boarding the vessel, Captain Evans had received the latest available United States Weather Bureau forecast over his own radio. He had also read the official United States Weather Report published in the final city edition of the morning Philadelphia Inquirer. Both the radio and newspaper reports forecast light snow, with clearing later in the morning.

49. The latest available United States Weather Bureau forecast at 0900 was prepared at 0500, and no changes in this report were made in the interval. The forecast predicted light intermittent snow with clearing later in the day. No substantial reduction in visibility on account of snow was predicted.

50. The pilot called the Delair Railroad Bridge and the Tacony Palmyra Bridge on his portable radio telephone prior to departure from Pier 122 South, but received on answer from the Delair Bridge. The Tacony Palmyra Bridge operator reported light snow and clearing visibility at the bridge. When the vessel arrived, visibility was 1½ to 2 miles.

51. Visibility at the Tacony Palmyra Bridge was verified by sighting objects at a known distance from the bridges. Their observations have been found to be accurate.

52. Visibility at Pier 122 South during the undocking was no less than 1½ to 2 miles, greater in some directions.

53. The pilot advised the master that it would be prudent to sail from Pier 122 South, basing his opinion on the foregoing weather forecasts and actual observations.

54. Actual weather observations and forecasts and the available predictions of the Weather Bureau at the time of the vessel's departure did not predict sudden heavy snow squalls and sharply reduced visibility above the Tacony Palmyra Bridge, and such weather and visibility could not have been reasonably foreseen.

55. The vessel commenced undocking at 0916 and was clear of the dock at 0929. At this time, visibility had improved and from time to time, the towers of the Ben Franklin Bridge, about 4½ miles distant were seen. Her tugs were away and the vessel commenced the upriver transit at 0948. The tide and current were flooding at 1½ knots.

56. The pilot, master, helmsman and the officer of the watch were in the wheelhouse at all material times and a lookout was stationed on the bow. Also, full watch was maintained in the engine room at all material times.

57. The vessel's pilot had had considerable experience in handling the ORE SATURN and her sister ships, as well as other similar ore ships in the Upper Delaware River. Captain Evans also had had substantial experience during his ten years' service as a river pilot in the use and interpretation of radar in the Delaware River in all weather conditions. He was fully familiar with the effect of different weather conditions on the clarity and reception of objects shown on the SATURN'S radar scope.

58. Visibility was never less than 1½ to 2 miles in light, intermittent snow as the vessel proceeded slowly upriver through the harbor to the Tacony Palmyra Bridge.

59. The ORE SATURN passed under the Walt Whitman Bridge at 0950, the Benjamin Franklin Bridge at 1011, and Delair Bridge at 1050. Visibility was approximately 1½ miles in light intermittent snow throughout.

60. The radar was operating satisfactorily, and picking up buoys at a distance of about 1½ to 2 miles during the transit through the harbor.

61. The vessel continued upstream without incident, passing under the draw of the Tacony Palmyra Bridge at 1105. At this time, visibility continued at 1½ to 2 miles in light, intermittent snow.

62. The current was flooding at 1½ knots when the ORE SATURN reached the vicinity of Northern Metal Company's piers. Shortly after passing the

foregoing pier, snow suddenly became thicker and heavier and visibility was unexpectedly reduced to 1 mile in the vicinity of the piers. The sudden change in weather conditions and in visibility could not reasonably have been anticipated or foreseen by the ORE SATURN'S navigators and had not been predicted in the weather forecasts.

63. After the ORE SATURN passed Torresdale Water Works and the dredge President (1124), the snow became heavier. By the time the vessel hauled into Mud Island Range, the snow had reduced visibility to ½ to ¾ of a mile.

64. The effective range of reception of buoys on the ORE SATURN'S radar which was under constant observation of the pilot or her master had been reduced to approximately ¾ of a mile by the time the vessel hauled onto Mud Island Range at buoy RB. The radar intermittently picked up buoys at 1 mile and clearly showed buoys at ¾ of a mile. Heavy dense snow reduces the effective range of radar. This is normally to be expected in such dense snow. The radar's effectiveness in heavy snow would not have been increased by switching to a greater range or making any other adjustment on the machine. Switching to a different range would have the further adverse effect of blanking out the set for a few moments.

65. When the ORE SATURN was about abeam of buoy RB, buoy 22, the next buoy on Mud Island Range, was observed on radar at approximately ¾ of a mile, bearing just off the starboard of the vessel's heading flasher. Buoy 22 appeared to be on its proper position.

66. The ORE SATURN passed buoy RB on her starboard side at 100 to 150 feet. Visibility was about ½ to ¾ of a mile. As the vessel passed RB indistinct but definite shorelines were observed in the radar scope; however, no specific reference points were observable which could be used for navigation and comparison with the positions of any buoys or the position of RB prior to grounding.

67. Mr. Gilbert C. Fonda, an independent radar expert, called by libellant, transited the Upper Delaware River from Philadelphia to Morrisville on the ORE SATURN in July, 1969 and observed her radar function under ideal conditions. Mr. Fonda confirmed it was not possible to identify in this radar or any similar radar any landmarks in Mud Island and Enterprise Ranges which could be used as reference points for navigation, or for verifying the position of any buoys notwithstanding that his observations took place while the radar was functioning satisfactorily under the ideal conditions.

68. When the ORE SATURN was passing abeam of buoy 22 at a distance of 100 to 150 feet, Captain Evans visually observed black can buoy 23 on the Pennsylvania side of the channel to be a little less than a half mile distant.

69. Captain Evans observed buoy 26 for the first time in radar bearing to starboard of her heading flasher, when the vessel was passing abeam of buoy 22 which appeared to be on station. The intended position of buoy 26 is ⁹⁄₁₀ of a mile upstream of buoy 22 marking the turn from Mud Island to Enterprise Range. The buoy appeared to be in its correct charted position as observed by radar.

70. As the vessel passed buoy 22 snow continued to thicken and become more intense. Under the prevailing weather conditions of dense snow and reduced visibility, the ORE SATURN'S navigators had no way to determine by radar that buoy 26 was off station 230 yards downstream of its charted position. It appeared to be on the edge of the channel where it was, in fact, found after the grounding but further downstream than its intended position.

71. Shortly after passing buoy 22, the ORE SATURN passed abeam of buoy 23 on her port side. At this point visibility suddenly worsened and her navigators could barely see buoy 23 with the naked eye. No other aids to navigation were visually observed. Buoy 23

was not seen at any time on the ORE SATURN'S radar.

72. While passing buoy 23 visibility was a ship length and a half ahead, nil on the port side, quarter of a mile on the starboard side and no more than ¾ of a mile astern.

73. The lookout reported by telephone that he had sighted buoy 26 visually, when the buoy was about a ship length ahead of the bow. The lookout's report was received by Mr. McLean, the mate on watch, and reported to the pilot.

74. Buoy 26 was visually observed by Captain Evans from the bridge of the ORE SATURN when the buoy was about a ship length forward of the bridge and off the starboard bow. Visibility at this time was about a ship length ahead, and nil on the port side, and about a ship length on the starboard side.

Buoys 28 and 30, ahead on Enterprise Range, were seen for the first time in the radar at this time on the starboard of the heading flasher on the radar.

75. At about 1141 the vessel decreased her speed from half ahead to slow ahead just before reaching buoy 26.

76. The vessel passed buoy 26 about 100–150 feet abeam of the vessel's starboard side at about 1142 ORE SATURN bridge time.

77. When about abeam of buoy 26, the vessel commenced her turn from Mud Island onto Enterprise Range. The pilot ordered 10° right rudder, then 20° right rudder for a total change of direction of 20°, the usual helm orders for the turn. While the vessel was swinging into the turn, the pilot ordered the wheel midship and then steady on course 062°, the usual course for vessels bound up-river. The vessel steadied up on the Enterprise Range course at 062°.

The pilot's turn orders were proper, prudent and reasonable.

78. The pilot's rudder orders were proper and usual and were promptly executed by the helmsman.

79. At about 1143, a jarring was felt and it was determined the vessel was aground on her starboard side. Immediately the gyro compass was checked and it was determined that the vessel was on a heading of 061½°. The vessel struck bottom in way of the foreward pump-room and scraped down the entire length of her starboard side.

80. Immediately after the impact, the pilot ordered full ahead (1143) and then hard left on the rudder. Shortly thereafter, the vessel steadied up on course 62° and continued to Morrisville without further incident.

81. At the time of the grounding, there was dense heavy snow; visibility was about a ship length ahead, nil on the port side, a ship length astern and no more than ¾ mile off the vessel's starboard quarter. This reduced visibility was unexpected and could not reasonably have been foreseen before the vessel left Pier 122 South.

82. In restricted visibility the pilot had no choice but to continue on and commence the turn onto Enterprise Range at buoy 26, relying on that buoy as the only visible aid to navigation. The pilot made the turn in the same manner as he would have turned in clear weather, although, had range lights been visible, the pilot would have steered on the range lights, in preference to relying on the buoy. Mr. Fonda confirmed that even under ideal conditions in Mud Island and Enterprise Ranges, the only objects visible in the radar available for fixing a position were the buoys.

83. When the vessel was turning onto Enterprise Range, if the radar bearing cursor had been preset for the Enterprise Range course to show the bearing of buoy 28 to the centerline of the vessel, it would not have furnished the navigator with enough information accurately to determine for purposes of navigation that buoy 26 was off station or demonstrate a need to alter course. Even if a discrepancy in the positions of buoy 26 and 28 had been detected, the navigator could not possibly have deter-

mined which of the two buoys was off station so as to execute the turn accordingly.

84. When the ORE SATURN was abeam of buoy 23, the use of a variable range ring on the radar scope could not have ascertained that buoy 26 was off station, since such a determination was mechanically impossible. Buoy 23 is charted at .35 of a mile distant from the proper position of buoy 26. Since the variable range ringe cannot be adjusted below the first fixed ring, it will not measure distances less than one-half mile.

85. A bearing cursor could not have been used when the vessel was at buoy 26 to determine that that buoy was off station, even it if had been preset to the charted bearing between buoys 26 and 28. The difference in bearing between buoy 26 and 28 when 26 was on station and its position when found on February 10 (230 yards bearing 234° from the charted position) is only ¾ of a degree. This difference could not have been detected by the use of the bearing cursor.

86. The downstream Enterprise Range lights could not be seen in the radar, therefore, the stern flasher was of no assistance to the ORE SATURN'S navigators.

87. The off-station position of buoy 26 could not reasonably have been ascertained by the ORE SATURN by radar because there were no landmarks or range lights visible in the radar or towers or stacks identifiable in the radar screen by which to verify the position of the buoy.

88. We find that in clear weather the turn onto Enterprise Range would have been made in the same fashion as the turn was made on February 10 in heavy dense snow. At this time, the buoy was about 100–150 feet off the starboard side beam.

89. The ORE SATURN'S trial test data which was offered by the United States was performed under materially different circumstances from those prevailing on February 10, 1964, in that on the trial test the vessel was only half loaded as compared with her draft of 32–6 on February 10. Her half loaded draft was 21' 1¾" forward and 27' 1½" aft. Furthermore, the turning circle test during the builders' trial was made with hard over rudder. The ORE SATURN made her turn onto Enterprise Range with a 10° right rudder followed by another 20° right rudder for a total 20° turn followed by an order for rudder and midships to steady up on course 062°. The turning circle test was made at full sea speed while the ORE SATURN proceeded in the Upper Delaware River on slow ahead and various other harbor manoeuvering speeds and turned from Mud Island to Enterprise on minimum steerageway with her engines set on slow ahead making approximately 6 knots over the ground.

90. The pilot's customary course on Enterprise Range and the ORE SATURN'S course on February 10 was 062° true. As a local pilot, Captain Evans' opinion for the best course for the range is accepted.

91. In the circumstances of this case, the pilot's opinion that 062° true is the best course instead of 062½ or 061½ should be given great weight particularly since he was acutely aware of the tidal sets at various range locations on the range through which he had successfully navigated other loaded ore vessels many times on the same range course.

92. Pilots navigating in the Upper Delaware River were aware of the duties of the United States Coast Guard and its expertise and regular attendance on critical buoys, such as 26. In these circumstances, there is every reason for the pilot to assume, particularly in the Upper Delaware, that a buoy marking a turn has been properly positioned and maintained.

93. There is no Delaware River anchorage between Philadelphia and Mor-

risville, above the Delair Railroad Bridge nor any berth for a vessel the size of the ORE SATURN. Consequently, once above the bridge, Captain Evans had no choice but to continue on to the vessel's destination at Morrisville without stopping.

94. The ORE SATURN could not anchor in the channel above Delair Bridge without incurring substantial risk of grounding and attendant damage or risk of collision from other vessels under the prevailing condition of reduced visibility from snow.

95. The ORE SATURN'S navigation and that of Pilot Evans was reasonable and prudent in the circumstances and they are exonerated.

## CONTINUED DISCUSSION

■ In reaching the foregoing findings we have carefully reviewed the record. It is clearly evident that proper inquiry was made as to forecasted weather conditions before a decision was made to leave Pier 122. Existing weather conditions at that time were duly observed. Based upon those observations and weather forecasts, which indicated clearing conditions, the decision to proceed upriver was a reasonable one under the circumstances. Moreover, contacts with bridge authorities supported the decision to proceed. We cannot fault the pilot and certainly not the master. Conditions observed as the vessel proceeded upriver did not indicate or suggest that the weather would suddenly "close in" reducing visibility to the point where the pilot would have to rely upon buoy 26 in making the turn from Mud Island to Enterprise Range. In proceeding to make the turn, the pilot followed the same procedures, courses and speeds as his past experience and knowledge dictated. He could do no more and he did no less. His conclusions must be given the weight they properly deserve as an experienced river pilot. Jacksonville Shipyards, Inc. v. SS Hongkong Clipper 309 F.Supp. 1196, 1201 (D.C.S.C.1970). There was,

under the circumstances, no basis for the master's interference with the navigational judgment being exercised at the time by the pilot. Union Shipping & Trading Co. v. United States, 127 F.2d 771, 775 (2d Cir. 1942). The pilot was aware of tidal sets and other conditions peculiar to the area. He was obliged, under the unusual weather conditions prevailing, to rely upon buoy 26 and to set his courses in accordance with his knowledge of the range and his past practices and experience which had safely taken him to his destination on past occasions.

Therefore, we make the following:

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties.

2. The causes of action pleaded fall within the jurisdiction of the Suits in Admiralty Act, as amended September 13, 1960.

3. The United States Coast Guard has a statutory duty to service, maintain and position aids to navigation, including buoys, in navigable waters of the United States, including the Delaware River, as well as to see to the positioning and maintenance of range light towers. (14 U.S.C. §§ 2 and 81). In the course of the execution of these statutory duties, the United States Coast Guard has published regulations which are mandatory. These include United States Coast Guard publication CG300, entitled United States Coast Guard Regulations. The United States Coast Guard Third District Headquarters, in execution of its statutory duties, published an extensive operations plan for the positioning, maintenance and servicing of buoys in the Upper Delaware River.

4. The United States through the United States Coast Guard and Geodetic Survey (Nautical Chart Division) was responsible for drafting, printing and distributing current and accurate navigation charts for the use of mariners, including the Upper Delaware River.

5. In the course of the improvement of the new 40 foot channel to Morrisville, the United States Coast Guard was responsible for the disassembling and removal of old range light towers and the reassembling and reestablishment of new range light towers in the positions designated by joint consultation between the Army Engineers and the United States Coast Guard.

6. The United States Coast Guard negligently carried out its duty to maintain buoy 26 on station in the Upper Delaware River in 1963 and 1964. The United States is held solely responsible to libellant for this negligence.

7. The United States Coast Guard buoy tenders ZINNIA and LILAC were negligent in the performance of their duties on May 23, June 4, August 6, and January 17, 1964, of positioning buoy 26 and/or resetting it on station.

8. The United States, in the performance of its work servicing buoys in the Upper Delaware River, was negligent in establishing the new position of buoy 26 on or about May 23, 1963, in a new authorized position which was to mark the turn from Mud Island to Enterprise Range to effectuate the new authorized channel alignment.

9. The United States Coast Guard was negligent on three separate occasions after May 23, 1963, and prior to the grounding for the failure to establish buoy 26 on its authorized station marking the turn from Mud Island to Enterprise Range.

10. The United States Coast Guard was negligent in servicing and positioning buoy 26 on June 4, 1963, in failing to properly identify land marks necessary to take accurate sextant angles to place the buoy on position and failing to position the buoy in its authorized location.

11. The United States Coast Guard was negligent in servicing and positioning buoy 26 on August 6, 1963, in failing to properly identify land marks necessary to take accurate sextant angles to place the buoy on position and failing to position the buoy in its authorized location.

12. The United States Coast Guard was negligent in servicing of buoy 26 on January 17, 1964, and in failing to reposition buoy 26 on its authorized position marking the turn from Mud Island to Enterprise Range.

13. A preponderance of the credible evidence establishes that the United States Coast Guard failed to maintain on station or properly position buoy 26 on its intended position between August 6, 1963 to February 12, 1964.

14. The United States was negligent in the mispositioning of buoy 26 on three separate occasions prior to the grounding.

15. The United States had constructive notice on several occasions prior to February 10, 1964, that buoy 26 was off station; specifically on July 18, September 3, 4, and October 2, and November 26, 1963, January 15 and 17, 1964; and was negligent in failing to move and reset the buoy on station and for allowing it to remain off station until after the grounding.

16. The navigation of the ORE SATURN in the Upper Delaware River on February 10, 1964, was prudent and reasonable in all the circumstances. It was prudent and reasonable for the master and pilot of the ORE SATURN to depart from Pier 122 South on the morning of February 10, 1964, in view of the United States Weather Bureau forecasts and prevailing weather conditions.

17. The master and pilot of the ORE SATURN were prudent and reasonable in ascertaining to the fullest extent possible from the available forecasts that visibility would be reasonable and satisfactory for navigation of the ORE SATURN.

18. The navigators of the ORE SATURN were prudent and reasonable and could not have anticipated snow squalls of the intensity here involved in the Upper Delaware River on the basis of the weather forecasts and their observations.

19. The navigators of the ORE SATURN were prudent and reasonable in continuing on after passing Tacony Palmyra Bridge.

20. The ORE SATURN'S navigators properly observed and reasonably and skillfully interpreted the vessel's radar in all the circumstances.

21. The ORE SATURN'S navigators reasonably and prudently observed all buoys, aids to navigation and landmarks appearing on the radar scope of the ORE SATURN under the prevailing weather conditions.

22. The ORE SATURN'S navigators made proper use of the radar including fixed range rings. Neither a variable range ring nor a bearing cursor would have permitted her navigators to ascertain that buoy 26 was off station as the vessel approached the turn onto Enterprise Range.

23. The ORE SATURN'S navigation in the Upper Delaware River was prudent and reasonable and her navigators properly executed the turn from Mud Island to Enterprise Range.

24. There was no credible evidence that the ORE SATURN'S navigation was imprudent or unreasonable.

25. The ORE SATURN grounded solely because buoy 26 was off station on February 10, 1964.

26. But for the negligence of the United States in failing to ascertain the off station position of buoy 26 there would have been no grounding.

27. But for the negligence of the United States in failing to position buoy 26, a particularly critical buoy, properly on station marking the turn from Mud Island to Enterprise Range, there would have been no grounding.

28. The United States is solely liable for all losses and damage sustained by the ORE SATURN as a result of the grounding in Enterprise Range on February 10, 1964.