Ernest E. BURGESS et al., Plaintiffs,

v.

M/V TAMANO et al., Defendants,
Appellees.

Appeal of UNITED STATES of America.

No. 76–1020.

United States Court of Appeals,
First Circuit.

Argued May 3, 1976.

Decided Aug. 24, 1977.

Allen van Emmerik, Atty., U. S. Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., Washington, D. C., Peter Mills, U. S. Atty., Portland, Me., Leonard Schaitman and Emmett B. Lewis, Attys., U. S. Dept. of Justice, Washington, D. C., were on brief, for appellant.

Joseph C. Smith, New York City, and Benjamin Thompson, with whom David P. Cluchey, Thompson, Willard & McNaboe, Portland, Me., and Burlingham, Underwood & Lord, New York City, were on brief, for defendants, appellees.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

ALDRICH, Senior Circuit Judge.

This appeal is from a finding of the district court for the District of Maine imposing upon the United States sole liability for a supertanker's striking a submerged ledge, and a consequent oil spill. The government denies fault, or, at the least, asserts that the fault was not its alone, and contends that the district court's contrary findings are clearly erroneous.

On July 22, 1972, at 0120 A.M., on a clear night, the Norwegian supertanker M/V TAMANO struck Buoy 6, a lighted buoy marking Soldier Ledge in Hussey Sound, Casco Bay, Maine, and seconds later grazed the ledge, holing her hull, and losing 100,000 gallons of heavy oil into the Bay. The TAMANO is a single screw vessel, 810 feet long, 128 foot beam, and was drawing 44 feet. In the modern style, her bridge is aft; the helmsman stands 650 feet from the bow. Her command was Captain Bjonnes, and she was being piloted by Captain Charles Dunbar, of Portland Pilots, Inc. Although the occurrence resulted in numerous lawsuits, in the present appeal appellees ship, and her owners, and the Pilots, are principally plaintiffs, and will be referred to as such, and appellant United States, charged with having caused the accident by mislocating the buoy, is the defendant. In a counterclaim, to be considered separately, the parties are reversed.

Hussey Sound is the approach to the Portland oil anchorage, and runs essentially northwesterly. It is marked, basically, by three lighted buoys, originally numbered 1, 4 and 5, and numbered at the time of the event, 3, 6 and 7. No. 3 is a green flashing gong buoy at the entrance, marking shoal ground easterly of Peaks Island, which constitutes the westerly side of the Sound. No. 6 is a red flasher marking Soldier Ledge in the middle of the Sound, and No. 7 is a white flashing bell, easterly of Pumpkin Nob, further up. The Sound is a gut, and one could enter just easterly of Buoy 3 and proceed 1700 yards 320° (true) to the same distance easterly of Buoy 7, passing just westerly of Buoy 6, 1250 yards along the way. This description is taken from the charted position of the buoys, and is not exact, if only because the scope of their mooring chains permits the buoys to swing with the tide. This is too tight a procedure for large vessels. Their practice is to enter well easterly of Buoy 3 and proceed on a course less than 320°, and then take a starboard curve around Buoy 6 and thence, approximately 350°, to pass clear of Buoy 7. A swing starting too soon after leaving Buoy 3 could strike Soldier Ledge; too late

would fetch the shelving ground making out from Peaks Island and Pumpkin Nob.

The space between the 10 fathom curve on the chart west of Soldier Ledge and the 10 fathom curve east of Peaks Island provides a channel 300 yards wide. In order to permit the maximum room for making the turn, Portland Pilots in 1967 persuaded the Coast Guard to move Buoy 6's station 150 feet easterly towards Soldier Ledge to a position "on the southwest tangent of the Ledge [because] we need every foot of channel room available." This put it so close that the court found that if its mooring, or sinker, was on station on the night in question, a 350° line from the buoy itself would pass only 22 feet clear of the ledge. Under some circumstances, the buoy's floating position might be even closer.

Two days before, on July 20, 1972, the Coast Guard COWSLIP, a 180-foot buoy-tender, placed two additional buoys at the outer approaches to the Sound, and serviced and renumbered the existing buoys as 3, 6 and 7. The following day the Coast Guard notified Portland Pilots of the new buoys and the renumbering of the old ones, and the fact that it had verified their positions. That night the TAMANO, with Captain Dunbar aboard, left the vicinity of Portland Lightship at 2335 and headed for the Sound. The sea was calm, there was no wind, and upon the quick disappearance of a light fog, it was dark and clear. After passing easterly of Buoy 3 at 0113 at a distance of 450 to 600 feet, Captain Dunbar steadied on a 310° course and then watched the relative motion of Buoys 6 and 7 as he approached to determine when to begin his starboard turn around Buoy 6. It was then about two hours before low water and the current was ebbing out the Sound at ¾ to 1 knot, about 154°. About four minutes after passing Buoy 3, Captain Dunbar got a "funny feeling" that Buoys 6 and 7 were opening sooner than he had expected. Fearing that he would run too far to the west and run aground off Peaks Island, he began his starboard turn, keeping Buoy 6 "fine off the bow," intending to pass close to it. About three minutes later, although

unaware of doing so, he struck the buoy, which had been lost sight of by the bridge complement because of the flare of the ship's bow. The buoy was brushed aside and passed along the starboard side of the ship, where it was then seen. Captain Dunbar stopped the engines to avoid fouling the buoy's chain, and as the buoy passed astern put the engines back full ahead and proceeded on a 350° course up and out of the Sound. It was not until they reached the anchorage that it was discovered that oil was leaking from the No. 1 starboard wing tank. Even then they did not realize they had grazed the ledge. The boatswain, who was standing in the bow, had reported the striking of the buoy, and the officers accordingly assumed that the buoy had holed the vessel. In point of fact, little appreciable damage was caused by, or to, the buoy. A long, straight gash was made by the ledge.

*Government Fault—The Evidence*

To commence with historical facts, when the COWSLIP serviced the Hussey Sound buoys on July 20, it believed Buoys 3 and 7 to be wrongly positioned, and moved them. In so doing it left Buoy 3's sinker about 130 feet northeast, and Buoy 7's about 175 feet northwest, of their charted stations. It did not move Buoy 6, believing it to be on station. The ultimate question upon which government liability depends is whether Buoy 6's sinker was in fact in its charted position ("C"), or was some 215 feet south-easterly thereof, in the position found by Wright ("W"), a professional surveyor, shortly after the casualty. We may say, in anticipation, that because of the demonstrated incompetence of the COWSLIP's new officers, no weight can be attached to their July 20 verification.[1]

By a singular circumstance, but based upon an elaborate reconstruction which the court warrantably accepted, if the TAMANO merely grazed the buoy, as the court found, the fact that she struck Soldier Ledge where it was found to be "coppered" meant that the buoy was in position "W," but if the buoy's initial contact was 39 feet inboard by the anchor, where the boatswain testified, this corresponded with its being at "C." In a sense, therefore, the case turns entirely upon the acceptance, or rejection, of the boatswain's testimony.

After the ship entered the Sound, Bos'n Hanssen, whose duty would be to let down the anchor, proceeded to a platform at the starboard side of the forward end of the forecastle. He was not a bow watch, and all he did initially, as the court found, was to "relax" while "awaiting orders."[2] He suddenly observed the flash of Buoy 6, 30–40 meters ahead, in a position he thought at first would escape collision. However, it did not, but came, he said, in contact with the ship's bow just below the starboard anchor, then tilted part way over and proceeded down the side. He thought he heard it strike twice again, but this was out of his sight.[3] The court believed Hanssen that

1. The district court found,

   "[T]he record is replete with evidence of the COWSLIP's ineptitude in setting and verifying the positions of the Hussey Sound buoys on July 20. The COWSLIP's navigational personnel were grossly lacking in experience."

   It could have said more. The government has spent an inordinate amount of time, by brief and oral argument, attacking this finding, which is not only not clearly wrong, but is clearly correct. Nor, of course, was it the first time the Coast Guard has been charged with a misplaced buoy. *E. g., Afran Transport Co. v. United States,* 2 Cir., 1970, 435 F.2d 213; *Richmond Marine v. United States,* D.S.N.Y., 1972, 350 F.Supp. 1210; *Universe Tankships, Inc. v. United States,* E.D.Pa., 1972, 336 F.Supp. 282 (improper buoy tendering). The government

does not question that Coast Guard error in this regard can impose liability. Cases, ante.

2. There was no bow watch. The starboard bridge watch, one Garcia, was not called by the ship, for reasons that do not appear.

3. Hanssen stated unreservedly that he saw the initial contact, and that he assumed later sounds (one of which, it seems, may have been the ship scraping the ledge) were subsequent contacts. The court's summary was as follows.

   "Hanssen claims that he saw the Tamano hit the buoy under the starboard anchor. He also claims to have heard the Tamano hit the buoy a second time in the vicinity of the aft end of the forecastle, and a third time further aft, as the buoy scraped the Tamano's side and hit the accommodation ladder."

the buoy was struck—and disbelieved Captain Dunbar that "we never came within, I would judge, 5 feet of it" [4]—but concluded that Hanssen, although the only witness, was wrong as to the location, and that instead of striking inboard by the anchor the buoy merely "grazed" the ship.[5] In so discrediting him it found as follows.

"Hanssen's testimony . . . was substantially shaken on cross-examination.[24]

> [24] Hanssen did not testify in person at the trial, but his deposition was made part of the record. On cross-examination he admitted that he did not actually see the buoy strike the Tamano's bow. His cross-examination further developed that he was alleged to be drunk, had numerous axes to grind, and was considered unreliable. He was also unable to explain why he had failed promptly to report to the bridge that the vessel had hit the buoy and did not mention this fact until ten minutes later when Storheil came forward to supervise the anchoring."

The source for most of this, however, was only counsel. In his closing argument one of plaintiffs' counsel, whose anxiety to dispose of Hanssen is understandable, but whose disregard of the record is less so, said the following.

"[The government's] whole case is predicated on one man's testimony, Hanssen, who was completely unreliable. He was alleged to be a drunk; he had all kinds of axes to grind; his cross-examination destroyed his credibility."

Starting with its footnote 24, ante, the court was, of course, correct that Hanssen testified only by deposition—meaning that it could not observe his courtroom demeanor. The next statement, that "he did not actually see the buoy strike the . . . bow" is true only in a very limited sense— that he did not see the precise physical contact.[6] Totally untrue is the court's statement that "he was alleged to be drunk." To be drunk at the time would cast a serious reflection on Hanssen's testimony. There was no such allegation, let alone evidence in support.[7] As to "numerous axes to grind," no witness suggested this. Counsel's sole support was his own suggestion, that Hanssen may have been vindictive because he had been posted for drinking. By Norwegian regulations, Captain Bjonnes was obligated to post him. There was no evidence that Hanssen felt it unwarranted, far less that it furnished him with "all kinds of axes." Hanssen was hoping for continued employment; if he had

To apply the word "claims" indiscriminately to these two aspects of Hanssen's testimony minimized the reservations the witness himself made with impressive particularity.

4. A contention the court found "incredible" in view of the seven-layer chips of paint found on the buoy's platform, the composition of which precisely matched samples taken from the ship's bow.

5. "13. The court rejects the contention of the United States that the Tamano struck Buoy No. 6 under its starboard anchor 39 feet inboard of the starboard side. The Court also rejects the contention of Tamano-Pilots that the Tamano did not strike Buoy No. 6. While the evidence clearly supports the conclusion that the Tamano contacted the buoy, it is most consistent with a finding that the contact was slight and that it occurred at a point much closer to the outer edge of the bow, most likely at the point where the bow begins to taper off into the flat side of the ship."

6. XQ, "You don't know what part of the buoy hit the ship; is that what you are saying?" A. "Yes, I mean that it had to be up here, [diagram] but it went so fast." This did not detract from what Hanssen said on a number of occasions as to where was "up here." E.g., A. "I saw that the buoy struck the vessel on the starboard side, in the vicinity of the anchor; and, after that, I ran and I stationed myself at the anchor to be ready." While he also testified that he saw the buoy "hit the anchor," it seems clear that he regarded this as equivalent. Q. "What part of the ship first struck the buoy?" A. "The starboard anchor, below the starboard anchor." The difference was a matter of height above the water, not location vis-a-vis the center line of the ship. See testimony of Chief Officer Steinsvaag, corroborating Hanssen, post.

7. What was in the record was plaintiffs' counsel's accusation that he was "a drunk"—a quite different matter, and untrue at that. Hanssen had been drunk eight days previously. Captain Bjonnes said that it might have happened once, but no more than once, before. While we do not award Hanssen a temperance medal, this is a slender stick with which to beat a witness, particularly to imply, what the court seemingly inferred, that he was drunk that night when sent forward by his superior to tend the anchor.

any axe, it was not to swing against the ship.

The court's statement that Hanssen was "considered unreliable" was, again, made up out of whole cloth, unless restricted to what plaintiffs' counsel may have personally considered. Put to it to justify their charge that Hanssen was "completely unreliable," plaintiffs' brief can only assert that Hanssen was restricted from certain activities because his "vision was suspect." The "suspect[ed]" defect was that, since 1956, he had color impairment. He had been a boatswain for ten years, and his duties were to "[p]ut the men to work." This is scarcely consistent with complete unreliability. Nothing in the record supports this serious charge, or the court's acceptance thereof.

Next, we can see no relevance in Hanssen's being "unable to explain why he failed promptly to report to the bridge" the fact they had hit the buoy. In the first place, he did explain—that he was not the lookout, and that he assumed the bridge had seen it, which caused him to run to his position to stand by for orders to anchor. We may add that if there had been any further duty, the fact of contact, not the exact spot, would seem the reportable emergency. The same must be said with respect to the court's criticism of Hanssen for "not mention[ing] this fact until ten minutes later when Storheil came forward to supervise the anchoring." Perhaps because it confused First Officer Storheil with Chief Officer Steinsvaag, the court failed to note here, or elsewhere, that Officer Steinsvaag, the one to whom he did speak, testified that Hanssen told him, "It hit under the anchor. . . He said on the starboard side, under the anchor." It is difficult to think that this unbiased, prompt corroboration of Hanssen's exact account, made at a time when there could have been no appreciation of the significance of the precise location, was not worthy even of mention when weighing Hanssen's credibility.

Finally, we return to the text of the court's opinion, to which the foregoing was attached as explanatory footnote 24, that Hanssen "was substantially shaken on cross-examination." We have read his deposition with care, and find it straightforward and direct, even painstaking. It was not shaken by anything recited in the court's footnote, nor by anything else.

Hanssen was on a platform by the bow. He was an experienced seaman. Totally alert, when he saw they were about to strike, he "lean[ed] over the rail" to see. The anchor was to his left. The outer part of the bow, where it blends into the side of the ship, viz., where the court's "grazing" must have occurred, was not only on his other side, but, as the exhibits show, considerably astern of him. We can understand why plaintiffs would like the court to believe he was drunk, prejudiced and unreliable. These charges being totally unsupported, we share the government's feeling that the only basis for rejecting Hanssen's account could be that the evidence that the buoy was off station was so compelling that, somehow, he had to be wrong.

Because the court did not assert reliance on it, we deal only briefly with a matter made much of at the trial, Captain Dunbar's "funny feeling" that Buoys 6 and 7 were opening prematurely.[8] The court found that Captain Dunbar felt "that the vessel had not been on the 310° course long enough for the buoys to be opening." This would be consistent with Buoy 6's sinker being at position "W," 215 feet southeasterly of "C," and almost correspondingly nearer to where Captain Dunbar believed himself to be. But equally it would be consist-

---

8. At the expense of stating the obvious, as one on a straight course approaches, and passes by, a fixed object, the object appears to move from whatever position it was initially off the bow towards the beam, and, ultimately, off the stern. At first, if the object is far ahead, the bow angle changes slowly, but the change accelerates as one comes nearer. Thus, in the case of two buoys off the starboard bow, such as Buoy 7, relatively far ahead, and Buoy 6, much closer, the angle of Buoy 7 changes slowly, and the angle of Buoy 6 comparatively rapidly, causing the difference, or the angle between them, to "open up." The closer to Buoy 6, the faster the opening. Conversely, to maintain an object at a constant angle off the bow would require a slow turn, or curve, which must increase as one approaches.

ent with Captain Dunbar himself being further ahead than he thought.

At night Captain Dunbar had no landmarks to guide him—only the buoys, and, as plaintiffs' counsel put it in oral argument, "a time clock in his mind." In point of fact, the clock was improperly programmed. Captain Dunbar estimated his speed at 5½ knots. Based on the testimony of the ship's officers, and the arrival time at the anchorage, the court found the speed to be 6–7 knots. An underestimate of only ½ knot for the four minutes would account for a 200 foot variance in the ship's position. We do not pursue this matter except to observe that under the circumstances Captain Dunbar's funny feeling would seem due to misplacing himself, rather than attributable to a 215 foot misplacement of the buoy.

The matter apparently troubling the court the most about Hanssen's testimony, apart from its found inherent defects, was that his location of the contact was "inconsistent with the uncontroverted physical evidence of the minimal damage to the buoy found following the casualty. . . . The probabilities are convincing that [for Tamano to strike the] buoy bluff on its bow would have badly damaged, if not destroyed, the buoy body, cage, protective ring and light."

Plaintiffs' counsel likened this to an automobile striking a brick wall. A government expert said this was an incorrect comparison.

"[T]hat's a different thing altogether. That's not—that's permanent, solid, that's not drifting. A buoy is almost drifting because you can hit a buoy and she will go with you."

All government witnesses testified that substantial damage is by no means inevitable, for this reason, and because of the cushioning, or sidesweeping effect of the bow wave, or pressure gradient.

Although the court realized to some extent that this was the government witnesses' position, it went on to say, "all three

conceded the likelihood that the buoy would have sustained more damage than it did." To this, after referring to the testimony of the plaintiffs' expert, post, it added,

"In short, *all four experts concur* that the damage observed on the buoy after the casualty was far less than that which they would have anticipated from the collision described by Hanssen." (Emphasis supplied.)

Not only was there no concurrence, this appraisal was incorrect as to all four of the witnesses.

Captain Young testified that because of the buoy's yielding, ante, he would not expect it to be damaged at all. Captain Stap testified, Q. "Would you expect the buoy by reason of that collision to be damaged in any particular way?" A. "No." He added, "You might knock off the radar reflector. You might at times even knock the light out, but I have run over buoys recently and they are still lit. . . ." Captain McNaughton testified, "[Y]ou could certainly have damaged the radar reflector and so on, but as far as damaging the buoy completely so that it would sink, no, it would just roll down along the side of the ship." No cross-examination reduced any of this testimony.

Finally, the court substantially overstated the evidence offered by plaintiffs' expert in rebuttal.

"The single navigational expert called by TAMANO-Pilots on this point, Captain Arthur H. Fertig, testified that the buoy would have been completely destroyed as a result of the impact."

Captain Fertig expressed no such opinion. His sole testimony was that he had had one experience, and that this was what happened. A single occurrence is no basis for a finding of probabilities. Far more impressive is the fact that, although he was their own expert, and provided an opportunity to contradict the government's, plaintiffs refrained from asking for an opinion as to probabilities. Instead, counsel supplied it themselves.[9]

---

9. "[N]ot [to] have any real bad damage to the buoy . . . defies all reason." "Captain Fertig said when it happened to him it decimat-

ed (sic) the buoy, and I have no doubt in my mind that's what would happen."

One witness did support plaintiffs on this subject, Professor Hamilton, a professor of naval architecture. He was not a "navigational expert," and testified to no actual experience with striking buoys, nor to any scientific analysis or experiments. Instead, he was prepared to generalize, drawing an analogy with butterflies striking the windshield of a fast moving automobile.

"I can't conceive of a ship with this fullness of bow hitting a buoy of this nature at 7½ knots at that angle on the waterline without substantial damage incurred by the buoy."

The court disbelieved this. "[I]t is possible that the Tamano might have hit the buoy under her starboard anchor without causing substantial damage . . . ."

Thus, four qualified and experienced captains, rather than testifying that the probabilities pointed to substantial damage to the buoy, testified, in effect, that consequences to a struck buoy are problematical and a matter of chance. In this circumstance it was a considerable stretch for the court, solely on the failure of a naval architect to conceive that there would not be substantial damage, to find that "[t]he probabilities are convincing [that the buoy would have been] badly damaged, if not destroyed." We can only think that it did so as the result of having misstated what it recognized as the navigational experts, and having been persuaded of the "high probability" of snagging by counsel's horizontal mooring chain demonstration.

Counsel's ability to supply favorable answers to questions he never asked peaked again with respect to the mooring chain and the claimed consequences to the buoy had it been struck in the manner Hanssen testified. The court found,

"At oral argument, Pilots' counsel also persuasively demonstrated the high probability that if the buoy had been struck by the Tamano on the starboard bow where Hanssen says he saw it . . . the Tamano's bulbous bow would have snagged the buoy's chain and carried the buoy and the sinker with it, causing very substantial damage to the buoy."

This persuasive demonstration consisted of drawing across the bow profile of Tamano's hull that was in evidence a buoy, and a line therefrom, representing the mooring chain, at an almost horizontal angle.[10] We may agree that, given the mooring chain so positioned, counsel's demonstration would have been persuasive.[11] What is notable, however, is that counsel had neglected, both in cross-examination of the government witnesses, and direct examination of his own, to make this demonstration through an authoritative source. The reason is not far to seek—the witnesses would have felt bound by the evidence. A mooring chain is not like a plastic rope, which, with the pull of the current, might extend in a flattened curve from the sinker to the buoy. Rather than as counsel depicted it, because of its great weight and the relatively light pull of the buoy the chain would extend along the bottom until it finally rose to the buoy. The uncontroverted evidence showed that in a modest current the ascending angle of the chain is but a small departure from the vertical. A picture may be worth a thousand words, but not one drawn by counsel without the words to back it up. The demonstration was worthless. Professor Hamilton's testimony, in the face of the navigational experts, stands but little better. We cannot support the court's probability finding even if hypothetical probability would be enough to offset factual testimony of an eyewitness. Cf. *J. Gerber & Co. v. S.S. Sabine Howaldt,* 2 Cir., 1971, 437 F.2d 580.

---

10. With some candor, counsel conceded that his chain did "not extend down the way one of the witnesses said it would have." With greater candor he should have said that no one but himself had contradicted the witness.

11. "[I]f the buoy is on the starboard bow where Hanssen says he saw it, the sinker is on the port bow; that means that with the bow the way it is shaped in the profile there's just no way that that ship is going to go forward [across the chain] and not carry the buoy and the sinker with it and cause very, very substantial damage to the buoy."

A matter of more serious consequence to the government, absent an explanation, is the admitted fact that the sinker was found about 215 feet southeasterly of its charted position shortly after the event. The government did furnish an explanation, but the court did not accept it. The government called a Professor Breslin, whom the court described as "unquestionably a distinguished naval architect and hydrodynamicist." Dr. Breslin testified to elaborate computations based upon the dimensions of the ship, its propeller, etc., and of the buoy, and gave an opinion that the force of the wake upon the buoy would be sufficient to dislodge the sinker and drive it astern, viz., in the direction away from its charted position that it was in fact found. The thrust of TAMANO's propeller was sufficient to move against the current at 6–7 knots over the bottom (due to a more modest input, Dr. Breslin's computations had been on an assumption of 5½ knots through the water) a hull with a displacement of 128 foot beam and 44 foot draft. If plaintiffs' expert, Professor Hamilton, could quarrel with Dr. Breslin's opinion of the force upon, and the consequences of the wake to, a buoy that was caught up in it, we may be sure he would do so. He made no attempt to. The court, however, rejected Dr. Breslin's conclusions.

"While Dr. Breslin's hypothesis is not beyond the realm of possibility, it appears to be highly speculative and to be based upon several critical assumptions which are not supported by the record."

The court then listed four matters, two of which are really repetitious; the third was expressly rejected by Dr. Breslin, and the fourth, which the court described as the "most serious flaw," we find demonstrably irrelevant.

Dr. Breslin admitted to one vulnerability. If the buoy was more than about 10 feet

abeam when it passed the stern, it is unlikely that it would be drawn into the wake. The court found the distance to be greater. Its analysis, however, in a number of respects conflicts with, in others ignores parts of, the record.

The court found,

"After grazing Buoy No. 6, the Tamano completed its turn and the buoy was 20 to 30 feet to starboard when it passed abeam of the bridge. The buoy was logged abeam the pilothouse at 0120. As the buoy passed down the Tamano's starboard side, Captain Dunbar stopped the vessel's engines to avoid having the buoy's mooring chain foul the propeller (0119.5). As the buoy passed clear aft, he put the engines Full Ahead (0120),[12] and steadied on a course of 350°.

. . . . .

"Dr. Breslin also assumed that there was no change in the Tamano's heading as the buoy passed down the vessel's side and that the ship's rudder remained amidship. The eyewitness testimony, however, discloses that the buoy was 20 to 30 feet to starboard when abeam the bridge; the stern of the vessel was moving away from the buoy; and the helm was not amidship when the Full Ahead order was given. Under these circumstances, it is highly dubious that the buoy could have been drawn in at a right angle to the vessel some 85 to 95 feet into the center of the propeller race at the point between 88 and 100 feet behind the stern where it would have been subjected to the 10,000-pound maximum force of the race. Dr. Breslin admitted that a port or starboard rudder would split and deflect the propeller race."[13]

To begin with the second paragraph, Dr. Breslin was not concerned with whether the vessel ran a straight course all the way

---

12. This seeming time discrepancy was due to a difference in the reading of the bridge and the course recorder clocks. This was not the only plaguing that came from the course recorder, upon whose reliability the court commented unfavorably.

13. With respect to this last, Dr. Breslin did so testify, but it was not an "admission." He had stated that the maximum force was not needed, and testified specifically that there would still be ample left to accomplish the dislodgment. Moreover, in point of fact, the ship was then on a straight course. See post.

from the point of contact with the buoy, but simply whether the buoy was close enough to the stern to be drawn into the wake—not at a right angle, but with the flow of water rounding the stern to fill in the space vacated by the ship. If the buoy was 20–30 feet away from the hull as it passed the bridge, and particularly if Captain Dunbar continued a starboard turn, which would swing his stern away from the buoy until it "passed clear aft," it would not have been so drawn. There are several vulnerable points in the court's findings, however. The first is internal inconsistency. Elsewhere the court found, based on "uncontroverted testimony," "[T]he gyro reading as Buoy No. 6 passed abeam the bridge [was] the vessel's heading as she struck the Ledge." Even in the W position, the one further away, the ship had to have struck the ledge before her stern reached the buoy. The entire passage over the ledge was straight. Captain Dunbar could not have steadied his course as the buoy passed clear aft.

Of the court's several findings, if its above-quoted passages are analyzed, we prefer the one that Captain Dunbar completed his turn after striking the buoy, partly because it corresponds with the testimony of Captain Bjonnes, who said that the buoy maintained the same distance all along the side as the ship proceeded, and because it makes sense that he would not have continued to turn easterly after reaching a buoy he must have known was already as close to the ledge as was possible.

If the ship was on a straight course, granted that the bow wave could have pushed the buoy to one side, as Dr. Breslin recognized, the question is the accuracy of the court's finding that the buoy was 20–30 feet away at the bridge. The court's figure stretches the contemporary consulate declaration testimony of the ship's officers, one of whom estimated one meter, and the other about two fathoms, off the side, although, admittedly, at a later date he changed this to 18–24 feet, and, instead, accepts the highly interested testimony of Captain Dunbar.[14] We need not question the captain's good faith, but he was vocal as to the amount of assistance his recollection received from counsel and his co-pilots. We may suspect that at the time of the incident he was more concerned about stopping the engines to avoid fouling his propeller and, notwithstanding the court's finding of an intention to hug the buoy within a few feet, post, more disturbed about being there at all, than he was in noting the exact distance of the buoy from the hull.[15]

The court's second reason for dismissing Dr. Breslin's opinion we have already disposed of. See n. 13, ante. Its final reason, which it terms the most serious, suggesting possible reservations about the correctness of the others, was totally inapplicable.

> "The most serious flaw in Dr. Breslin's analysis, however, is that it provides no explanation for the undisputed fact that Buoys No. 3 and No. 7 were both found to be off-station by significant distances."

Rather than a serious flaw, this was no flaw at all. In no way did Dr. Breslin seek to explain the position of Buoys 3 and 7, and in no possible way did their position bear any relation to his calculations, or testimony. Dr. Breslin's sole concern was the effect of the propeller on Buoy 6.

Finally,[16] in considering the likelihood, vel non, of Dr. Breslin's explanation, we note, if

---

**14.** Not that we wish to split hairs, but it was not an accurate summary to take Captain Dunbar's figure, which was the highest of four witnesses, as "the eyewitness testimony."

**15.** For a striking illustration of Captain Dunbar's lack of memory of events concerning this incident, we note that when his deposition was taken he could not recall how long after he had stopped the engines so that Buoy 6 "could pass clear aft," he stopped his right turn and steadied his course. He believed it "a couple of minutes . . . . a minute or two minutes,"

and that he did not straighten his course until after the buoy was astern. The time and distance were manifestly shorter.

**16.** We need not discuss the elaborate track records, constructed and presented by each side. The court amply pointed out the incorrect assumptions that went into each. While plaintiffs seek to capitalize on one point on which they coincide, we are not impressed by reasoning which would put two wrongs together to make a right.

his testimony be rejected, the extraordinary coincidence that if the buoy was not, in fact, moved by the ship, its unexplained extraneous movement off station happened to take precisely the direction that Dr. Breslin's hypothesis called for. In this circumstance, to discard his testimony because of the trial recollection of distance of plaintiffs' witnesses seems scarcely to follow probabilities. Yet their testimony, and specifically the enlargement over the consulate declarations when the officers' memories were still fresh, is the only one left of the criticisms advanced by the court. We cannot concur that Dr. Breslin's hypothesis was "highly speculative." Rather, everything considered, we believe the objection to be.

The court also relied on the testimony of one Pastore, a diver employed by plaintiffs to inspect Buoy 6's sinker on July 26. It was agreed that the sinker had not moved, unless by the TAMANO, between the time of servicing on July 20, and Pastore's inspection. Pastore found it upside down on rocky bottom in 120 feet of water, with no indication that it had recently moved. He based this conclusion on a swing around the sinker which showed "no indication of any movement," i. e., no disturbance. He was not asked on either direct or cross to give any further description or explanation of the bases of his opinion. He also found the bottom to be covered with rocks, with some sand and mud under the rock. Since the sinker had rolled, rather than dragged, see post, it is far from clear that such movement on such a bottom would have left any signs of disturbance. But we are not left to speculate since Pastore's further specific findings convincingly show that the sinker had indeed moved at some time after July 20.

Pastore found that the chain was wound three times around the sinker, so that of its 240 feet, only 175 feet were free. One may wonder what kind of force produced this result. The government makes a further point. Pastore inspected the buoy's sinker on July 26 at 0600 hours, which was low tide, while COWSLIP serviced the buoy on July 20 around 1700 hours, which was approaching high tide. Accordingly, if at position W, the sinker was then in about 127 feet of water. The court found, in accordance with Lt. Hall's testimony, that the mooring chain was not taken up on a short stay. However, Lt. Hall testified that when a buoy is brought aboard for servicing, even though not on a short stay, the practice is to disconnect the chain and lay 55–60 feet ("roughly 60 feet") of chain on the deck. If on July 20 the sinker was already in position W at which Pastore found it, and one subtracts 127 feet from 175 feet of free chain, there are only 48 feet left, from which must be deducted whatever would be consumed by the COWSLIP's freeboard. On this basis, not only could normal procedure not have been followed without unwinding some of the turns from the sinker, but if even half the normal amount of chain were placed on the deck they would have had to have been on a short stay, which the court found they were not. The net effect of Pastore's testimony was not the fact credited by the court that he saw no indication of movement, but the conclusion that the sinker could not have been in the W position when the buoy was serviced on July 20. If that conclusion is not compelled, at the very least it fully offsets whatever persuasiveness there was in Pastore's failure to note signs on the bottom of recent movement. We add, as a final comment, that this persuasiveness impressed the plaintiffs themselves so little that their position in final argument was that the COWSLIP herself had moved the sinker on July 20.

An area most troublesome for the plaintiffs is the failure of the Pilots to have noticed Buoy 6's displacement if, in fact, it was displaced prior to the casualty. This buoy was moved from its original station to C in 1967. It was repositioned there in October 1969. Three times thereafter, prior to July 20, 1972, this position was verified. Unless these prior verifications were incorrect, it had been at C for a long time. If, on the other hand, it was at W on July 22,

but had moved there recently, it must have moved in some unaccountable fashion, this being summer and not a storm period. The court did not address itself specifically to these alternatives, but the tenor of its opinion assumes the error to be of long standing. The government asks if Buoy 6 was, in fact, off station, how it could be that the Pilots, with their constant use of the Sound, had never noticed it. Plaintiffs themselves conceded the general principle. In oral argument below, while asserting they were not obligated to do so, the Pilots agreed that "[i]f they see a buoy that looks wrong to them, they report it immediately." In response to the court's inquiry how Pilots had failed, previously to the night in question, to see that the buoy was wrongly positioned, counsel stated, "First of all, there is no evidence here as far as I am concerned that the COWSLIP didn't do something to move that buoy off station when it was out there." The court, however, found that the buoy was not so moved.[17] Nor, if the buoy had been moved before then, was counsel's reply an answer addressed to the question why this had not been observed. Rather than a "first-of-all" answer, it was none.

Counsel's second reason was that correction was the government's responsibility, not the Pilots'. Conceding this to be legally so, it did not explain how the Pilots, in their own interests, could have failed to notice the displacement. Buoy 6 was the focal point of the turn which was, by common agreement, the most critical part of the passage. Portland Pilots were so conscious of its importance that they had sought the change from its pre–1967 location in precise terms, viz., easterly, 150 feet. Buoys 6 and 7 were the signposts and gateposts,[18] of the channel. A 215 foot southeasterly change from Buoy 6's new position, if effected, would have been a second 150 foot movement easterly, when the first had been determined to be the maximum permissible, and 150 feet southerly, increasing its distance from Buoy 7 by over 15%. If a 150 foot easterly movement effected an appreciable change in the curve, a second 150 feet would also seem appreciable.

The court found that "even in the daytime the pilot relies almost exclusively upon Buoys No. 3, No. 6 and No. 7." At the same time, a pilot is constantly checking. Taking Captain Dunbar's testimony itself, it is almost impossible to think that a discrepancy of this amount, in a relatively narrow passage, could have been long overlooked.

"There are some that you see and we are always continually looking for objects along our course or something that when we pass abeam of a buoy goes in back or a lighthouse goes in back, you see the relationship of how they move, and this is true going through Hussey Sound during the daytime; . . ."

"[T]he chart is in your head."

"[Y]ou just contact all this information and it goes subconscious . . .. It's amazing how you can spot something different whether it's been a week since you piloted or if you have been on a vacation and you get two or three weeks off, you . . . can pick out something that's happened, that's different."

Captain Dunbar's articulation of his intimate, and graphic, knowledge was not matched by an explanation why it would not have led him to detect a mispositioning of a vital mark so substantial in extent that it caused a grounding. He had been through the Sound over 100 times. The Pilots had averaged a trip a week during

---

17. This finding was not only not clearly wrong, but we would think, clearly correct. However incompetent were COWSLIP's officers at taking cross-bearings, we cannot believe they could unintentionally drag the sinker, a 4-ton cement block, 215 feet, or not be aware of doing so. Moreover, unlike the sudden force of being struck by the TAMANO's wake, we cannot visualize how such dragging could have rolled the block over, leaving it upside down with three loops of chain wound around it. The thought that the COWSLIP moved the sinker, contrary to the testimony of her officers, came from counsel, only, and was warrantably rejected.

18. As previously noted, Buoy 6 is a gatepost at the extreme edge.

1972. It is no wonder that plaintiffs attempted the answer that the change had occurred since their last passage.

The court did not address itself to the question how the displacement that it found could have escaped the prior attention of the Pilots. It started to discuss it, but then, instead, proceeded to deal with plaintiff's testimony to the effect that the mispositioning would not have been readily discoverable that night.

"Of particular significance, Buoy No. 7 was moved to a position about 175 feet to the Northwest of its charted position, which materially changed its orientation with respect to Buoy No. 6 and was undoubtedly the reason Captain Dunbar did not detect that Buoy No. 6 was off-station."

"The evidence . . . abundantly supports the conclusion that it was the Coast Guard's misplacement of Buoy No. 7 which changed the pilot's perspective and caused Captain Dunbar to commence the starboard turn too soon, and thereby to graze the buoy."

There was no evidence of any kind that Buoy 7's mispositioning materially changed Captain Dunbar's perspective. The only source we find was counsel's argument. Captain Dunbar himself testified,

"The sole reason for the incident is the Soldier's Ledge Buoy No. 6 was off station."

Because Buoy 7 was a very considerable distance ahead, we believe its movement did not, in fact, "materially change its orientation" with respect to the TAMANO.[19] But even had it done so, its change on July 20 could in no manner explain why Buoy 6's earlier position, if erroneous, had not been noticed prior to that date. The court's apparent failure to realize that the COWSLIP's having moved Buoy 7 off station on July 20 could not affect the pre-July 20 situation is reflected, indeed, emphasized, by its next sentence, a total non sequitur.

"The misplacement of Buoy No. 7 also adequately explains the reason groundings had not occurred prior to July 20."

The court's only statement of any relevance to the period prior to July 20 is in its footnote 33. It there observed that previous passages of vessels of TAMANO's size might have successfully traversed the ledge because they might have occurred at the upper stages of the tide, when there would have been clearance. While we think a better reason is that no careful pilot would have been there at any stage of the tide, all that this could explain is why the Pilots might not have learned of a mispositioning the hard way, not why they would not have noticed the buoy's displacement by visual observations conducted as part of their duty. As to this, the record offers no answer. This was not because they did not know how to supply an answer if there was one. *See Afran Transport Co. v. United States,* post, n.27, another COWSLIP case. Having in mind that plaintiffs had the burden of proof, their failure to explain either some cause of a recent movement, or why no one noticed a long-standing error, must weigh heavily against them.

*Government Fault—Conclusion*

In reviewing the decision of a court sitting without jury, the test is not whether there can be found "substantial evidence" supporting the conclusion. *Case v. Morrisette,* 1973, 155 U.S.App.D.C. 31, 38, 475 F.2d 1300, 1307 n.35; *Jackson v. Hartford Accident & Indemn. Co.,* 8 Cir., 1970, 422 F.2d 1272, 1275 (Lay, J., concurring), *cert. denied,* 400 U.S. 855, 91 S.Ct. 86, 27 L.Ed.2d 92; *Manning v. Gagne,* 1 Cir., 1939, 108 F.2d 718. Rather, the question is whether, on the record as a whole, the appellate court views the conclusion as clearly erroneous, viz., "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mis-

---

**19.** For what it is worth, we plotted this out on an enlarged scale, and agree that Buoy 7's misposition was not significant in the present context. If we have done this correctly, the change would appear to have affected its bow bearing, as seen from where Captain Dunbar commenced his turn, by only one degree.

take has been committed." *United States v. Gypsum Co.,* 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746. In the present case we have less than our usual hesitation in so finding because much of the court's underlying reasoning and important subsidiary findings are demonstrably mistaken. One of the primary reasons for F.R.Civ.P. 52(a)'s requirement that the court's findings be recited is to facilitate appellate review by making it clear how it reached its result. *Lemelson v. Kellogg Co.,* 2 Cir., 1971, 440 F.2d 986, 988; 9 Wright & Miller, Federal Practice & Procedure § 2571. Just as a conclusion not accompanied by subsidiary factfindings adequate to indicate how it was reached may be vulnerable, *Fehringer v. Bluebeard's Castle, Inc.,* 3 Cir., 1968, 395 F.2d 851; *see Featherstone v. Barash,* 10 Cir., 1965, 345 F.2d 246, 249–50; *Lemelson v. Kellogg Co.,* ante, one in substantial measure supported by unwarranted findings is less entitled to weight, *cf. United States v. Jobin,* 1 Cir., 1976, 535 F.2d 154, 157 and n.5.

■ The burden was on the plaintiffs. Of all the circumstances relied on by the court, only two support them. One is the fact that the buoy was found off station after the accident. The only real impeachment of the answering testimony, however, was the questionable finding of the distance the buoy was away from the ship at the time it passed the bridge. We have pointed out the weakness of its finding a certain omission in Dr. Breslin's opinion to be the "most serious flaw"—an omission that was, in fact, of no relevance whatever. The other circumstance was the lack of substantial damage to the buoy. While to a layman this might seem highly significant, it did not to qualified experts. Even the court, although denigrating their evidence by finding a nonexistent testimonial agreement, conceded the possibility of little dam-

age, but thought the opposite was "far more likely." We cannot give such weight to a naval architect's expectation of certain destruction in the face of the three experienced government navigational experts, and the silence of plaintiffs'. Neither in this court, nor in the court below, have plaintiffs responded, even through their resourceful counsel, to the silence of the Pilots themselves, who are faced not with a hypothetical, but the hard reality of a vital mark about which they did not complain. We are here reminded of Sherlock Holmes' dog in the nighttime, the significance of which was that he did not bark.[20] Above all this stands the clear and inherently credible testimony of the eyewitness Hanssen. Viewing the record as a whole, and plaintiffs' obligation to prove their case by a preponderance of the evidence, we hold the finding that the buoy was misplaced was clearly erroneous, and cannot stand.

*Navigational Negligence.*

■ Both because of its indirect bearing on plaintiffs' claim that the casualty was the government's fault, and because of its relevance to the government's counterclaim, post, we deal with Captain Dunbar's procedure. The court found that it was

"his intention . . . to clear the buoy by at least five feet.[12]
[12] Captain Dunbar testified, without contravention, that it was customary for the pilot to 'hug' Buoy 6 when entering the Hussey on an ebb tide in order to avoid grounding on Peaks Island."

We take this to mean that he intended to be not significantly further away, or the specification of such small footage would seem meaningless. At oral argument plaintiffs' counsel felt he testified in terms of intending 20–25 feet. In point of fact, he gave no figure, but simply stated an intention to pass "close." [21] He did state (erroneously)

---

20. A. Conan Doyle, *Silver Blaze,* "Before deciding that question [whether there had been an intruder] I had grasped the significance of the silence of the dog, for one true inference invariably suggests others. . . ."

21. Interestingly enough, Captain Dunbar's sole use of the word "hug" was with reference to

Eastern Approach Buoy 1, which he translated as meaning 3/10's of a mile. His concepts of distances, as demonstrated elsewhere in his testimony, seem extraordinarily elastic. So does his concept of bearings. Q. "[W]hat do you consider to be fine on the starboard bow?

that, in fact, he came no closer than five feet, which may have left the court with the impression that this was his original purpose. But whether such proximity was intended or unintended, we find he was at fault.[22]

It was, of course, essential, to avoid being carried by the tide onto Peaks Island. However, the channel, even between 10 fathom contours, was 300 yards wide. Rather than the "tight turn" before the Pilots induced the Coast Guard to move the Soldier Ledge buoy in 1967, it presented, in Captain Dunbar's words, a "long, slow swing," a "long, gradual swing." No witness, including Captain Dunbar, testified why it should be necessary to "hug" the buoy with such proximity, particularly a buoy on a line that passed, literally, within feet of a submerged and dangerous ledge. Particularly, too, at night, with a ship so large that the pilot stood over 200 yards from the bow, a bow which the court found, because of its flare, would conceal the buoy altogether on the last of the approach. The buoy itself was all there was to go by. The seriousness of its final occlusion was demonstrated by the fact that the ship's captain and first officer, although in their consular declaration they had felt that they "were getting too close," and "passing too close," to the buoy were, like Captain Dunbar himself, not aware that they had collided with it. Even so, there was marked concern on the bridge that their proximity risked fouling the propeller. Captain Bjonnes, for example, testified he "rushed out."

Like the government witnesses, and in the absence of any explanation, we see no possible purpose to be served by approaching so close. One must wonder what, viewed a priori, Captain Dunbar intended to do after he had brought his bow to within feet of the buoy, if that was his intent. Assuming his capability of maneuvering his bow with such accuracy, he still had the stern to contend with, and the danger of fouling. With the bow that close, he faced two alternatives: in order to keep his stern clear of the buoy and its mooring chain, he must continue to run straight as a die, in addition to stopping his engines as the buoy passed that same few feet from his stern, or he must continue · a starboard (easterly) turn to swing his stern away from the buoy. The latter would mean, since a ship pivots, swinging his bow in further towards the ledge when the buoy was already, at the Pilots' 1967 request, "every foot" as far east as it could go. In spite of the court's finding, we must greatly doubt that such closeness was Captain Dunbar's original intention. But, conversely, if it was not his intention, to have maintained his curve towards the buoy, and not straighten out until he struck it, can only reflect on his eyeballing capacity, or on his use of it. However one looks at it, he was guilty of a gross fault.

■ Instead of finding it a fault, the court found Captain Dunbar's hugging "customary" "without contravention." Holding up against the ebb tide was cus-

A. "Four degrees off the starboard bow, perhaps, . . .—it might be a point [$11\frac{1}{2}°$] . . . .. It's going to vary. If it was eleven degrees, it might go to twelve. It might do down to ten, but you are trying to keep a nice even turn and keep that buoy fine on your starboard bow. That's why I think it is fair to say 'fine' rather than the actual degrees." Captain Dunbar willingly accepted the description of this being navigation "by the seat of your pants." We are tempted to observe that at least by hindsight, there seems much to be said for the government experts who testified he should have been maintaining a radar check as well.

22. We need not determine whether the establishment of the appropriate standard of care is to be included within the ordinary rule that findings in negligence cases fall within the clear error rule, *McAllister v. United States*, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; 9 Wright & Miller, Federal Practice & Procedure § 2590, or is not, *Mamiye Bros. v. Barber Steamship Lines, Inc.*, 2 Cir., 1966, 360 F.2d 774, 776, *cert. denied,* 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70; *cf. Pacific Tow Boat Co. v. States Marine Corp.,* 9 Cir., 1960, 276 F.2d 745, 752. Even if within the clear error rule, the establishment of the standard of care is a sufficiently legal, as opposed to factual, matter that we would be more willing than ordinary to find clear error. Whichever rule applies, we cannot accept the district court's exoneration.

tomary, but Captain Dunbar markedly overdid it.[23] The court's finding overlooked the declaration opinions of the ship's officers that they were too close. More serious, it overlooked the testimony of two government experts, who stated that proper procedure called for clearing this buoy by 100 feet or more. While it is true that one government witness conceded that special circumstances might justify approaching buoys to within 25–50 feet, with a channel that wide no one testified to such circumstances, and this witness expressly denied them. Rather than "customary" "without contravention," the evidence was precisely the opposite. The only commendation of Captain Dunbar, unless one so reads Captain Bjonnes' deposition,[24] came, once again, from counsel.[25]

On this basis, even if the buoy was mispositioned, an, if not the, operative fault was Captain Dunbar's. In charge of a bow over 200 yards away from him, affected by a current which he agreed he could not precisely estimate, he steamed by his own observation, whether intentionally or not, to within a few feet of a buoy known to be almost on top of an invisible ledge. The

Peaks Island shoals for which he professed apprehension were 300 yards (less the ship's beam) distant. Even if the buoy were in position W, if he had straightened out in time to keep the 25–50 feet away that one of the government witnesses conceded could be an appropriate minimum in exigent circumstances, there would have been no grounding.

In oral argument plaintiffs attempted to lay the blame for Captain Dunbar's striking the buoy upon the turn that he was caused to make because of the buoy's mispositioning.

> "Once you start that turn, which I say was triggered because of the angle between Buoy 6 and Buoy 7 was wrong, because they were off station, there was no way to correct it, and I think the United States' experts in the evidence have agreed with this."

The court, in its opinion, responded,

> "[T]he expert navigational witnesses agree that once the Tamano was committed to the starboard turn, contact with the buoy was inevitable."

**23.** We cannot, by any possibility, share the district court's feeling that, with a channel that wide, to come within 22 feet of a crippling ledge is to "pass well to the west and clear." For a ship of this size, that would seem hairbreadth measurement. Moreover, 22 feet clearance on this occasion might not be 22 feet on another. The court's finding was based on Wright's estimate of where the buoy would have been two hours before low water with the sinker at its charted position, and travel of the buoy along the surface from the sinker of about 95 feet. This assumption was based on observations of the buoy when the sinker was in 120 feet of water, and thus did not take into account the greater travel there would be when the sinker was in its charted position of only 73 feet of water. Moreover, it was based on observations at a time when the chain was wrapped around the sinker three times; obviously, if the full 240 feet of chain were free, the buoy's travel along the surface could be much greater. Captain Dunbar had no idea of the buoy's circle of travel. In his pretrial deposition he estimated a 50 foot radius. At trial he said 75 feet maximum. Obviously it was more. The Pilots' failure to make inquiry of the Coast Guard of the chain's length until after the casualty seems a sad commentary. It was the Pilots' duty to have, at their fingertips, all infor-

mation of any pertinency to their procedure. *Essex County Elec. Co. v. M/V Godafoss,* D.Mass., 1955, 129 F.Supp. 657. The alternatives are that Captain Dunbar was inexcusably uninformed, or this information was not considered relevant because no one intended ever to be close enough to the buoy to make it so. The captain is on one horn of a dilemma, or the other.

**24.** Although in his declaration five days after the event Captain Bjonnes stated they were passing two fathoms from the buoy and that he considered it "too close," in his later deposition, introduced at the trial, his "best estimate" was "Two, three, four fathoms." "18 or 24 feet, about. I considered it a safe distance." Since still at deposition time he admitted he had been afraid "about getting hung up in the mooring of the buoy," one may suspect that the volunteered opinion that he "considered it safe" may have been a re-consideration based on a later appreciation of the damaging effect of the declaration. In any event, even it was short of a ringing endorsement.

**25.** "There wasn't one of those four witnesses that could find anything wrong with Captain Dunbar's navigation."

The turn, in other words, committed her to proceed inevitably, like a train on a track. There was no such testimony, let alone an agreement. The evidence was that there had to be a carefully taken curve; there was none that it had to be exact, or persisted in until a buoy, in plain sight, was run down. The court's finding shows not only a misreading of the record, but a serious misconception of piloting procedure.

In the first place, to determine an exact course in advance one must know the point of departure. Captain Dunbar did not know, and never planned to know, with precision, where he started his turn. He made no attempt to fix the distance the ship passed abeam of Buoy 3. Nor did he attempt to measure his speed, and he denied confidence in the exact amount of current across his course. In these circumstances, even had he known his original distance from Buoy 3, after running "about four minutes" he was necessarily in a gray area in which he could not locate himself without measurements, none of which he made. Even had he done so, we may wonder how it would have enabled him to determine in advance an exact curve that would hug a distant buoy by clearing it by a few feet.

Captain Dunbar's procedure was quite different. Without concern for his precise point of departure, he set his course "fine by the buoy," using "ten or fifteen or twenty degrees right rudder" to "maintain a constant fine bearing," a procedure which, if he meant "constant" literally, meant increasing the curve as he proceeded. See n.8, ante. This procedure was not dependent upon the exact point at which he commenced his curve. Nor was he on an "inevitable" track. Rather, during these three minutes the ship's course was determined by his periodic instructions. Speaking with reference to this very passage, his companion pilot, Captain Ferguson, put it clearly. "Due to Captain Dunbar's orders, the vessel

doesn't stay on a perfect track line; it moves back and forth." See also, n.21, ante. Captain Dunbar obviously intended, at some point, to terminate his curve towards the buoy and straighten out. His error, although the buoy was fully visible— First Officer Storheil testified that even before the start of the turn he could see the buoy itself, not merely the flash, and Captain Dunbar testified that by his "eyeballing" he could tell its distance more accurately than by radar—was that he failed to do so soon enough. No witness testified that anything in the original turn obligated this persistence, let alone that contact was inevitable. Plaintiffs point to testimony that a turn started too soon would lead closer to the buoy. Without pausing here to analyze just what this meant, it was not a statement that one was committed not to desist before the closeness of a seen object became too close.[26]

Quite apart from striking the buoy, by his own interpretation of his distance away, Captain Dunbar came too close. On the record, we see no excuse. We cannot accept the court's finding that Captain Dunbar was not negligent; the contrary was established.

### The TAMANO's Premature Entry into Hussey Sound.

Looking at the total picture rather than the individually discussed parts, the TAMANO came through a channel 300 yards wide, struck a lighted buoy on the outer edge known to be every foot as close as possible to a submerged ledge, and walked away from the consequent environmental destruction by saying that the buoy must have been misplaced. Buoys do get misplaced, and regrettable as it is that the Coast Guard should man a buoy tender with unqualified personnel, human error will always be with us. See n.1, ante. Every nautical publication emphasizes the dangers

26. We may add our own observation, that turning too soon would seem a false issue. Starting too soon must mean too soon with relation to the buoy's position off the bow. This is not what Captain Dunbar did. On the contrary, it

was because the angle had already, though unexpectedly, opened up to the point of dictating the turn that he took it, not too soon, but "seconds after I thought I should have."

of total dependence upon floating aids.[27] At one point in his testimony Captain Dunbar stated,

Q. "[D]id you in fact rely strictly on those three buoys?"

A. "Yes. There's nothing else there to rely on. . . . [A]t night, one o'clock in the morning . . . there are no shore lights, there are no spires on [sic] houses with which one can see. It's like going through the inside of a black cat. You have three buoys and that's it. . . . [If you have a shoreline available] [t]hat makes it a heck of a lot easier during the daytime, yes, but it is not possible at night."[28]

·In this circumstance the government argues that it was negligence on the part of the ship, as well as by Captain Dunbar, to have entered at night when, by waiting a few hours outside, which Captain Bjonnes testified he would have been willing to do because he could not discharge for another 24 hours, not only would they have had daylight, but the ledge itself would have been sufficiently covered to remove the danger. In view of the enormous capability of harm in case of miscarriage, as this case demonstrated with only a partial spill, we see much merit in this claim. *Urie v. Thompson,* 1949, 337 U.S. 163, 179, 69 S.Ct. 1018, 93 L.Ed. 1282; *United States v. Carroll,* 2

Cir., 1947, 159 F.2d 169, 173; Restatement (Second) of Torts, § 298 (1965); W. Prosser, The Law of Torts, § 31 (4th ed. 1971). It was no sufficient answer that it was customary to enter at night, and that the Coast Guard had not forbidden it. *Texas & Pac. Ry. v. Behymer,* 1903, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905; *The T. J. Hooper,* 2 Cir., 1932, 60 F.2d 737, 740 (L. Hand, J.), *cert. denied,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571; Restatement, ante, § 33; Prosser, ante, § 33. Our rulings in other matters, however, make it unnecessary to pursue this question, except to observe that the court's treatment was overlight.

*The Government's Claim for Cleanup Costs.*

The court's finding the government solely responsible for the oil spill defeated the government's counterclaim under 33 U.S.C. § 1321(f)(1),[29] formerly section 1161(f)(1), for certain cleanup costs that it had incurred pursuant to section 1321(d). Our reversal establishes this claim, unless Captain Dunbar, as a compulsory pilot, is to be regarded as a "third party."

■ Within specified monetary limits a vessel discharging oil in violation of section 1321(b)(3) and her owners are liable without fault for the government's cleanup costs, with certain exceptions, the last being the

27. If *Afran Transport Co. v. United States,* 2 Cir., 1970, 435 F.2d 213, *cert. denied,* 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116, is to be read to the contrary, we do not agree with it. However, *Afran* is notable in that the plaintiff in that instance offered extensive testimony why the misplacement of the buoy there involved was not easily verifiable by a pilot.

28. Realizing the import of this concession a bit late, Captain Dunbar sought to back away by saying,

"During the day, there are certain advantages to seeing. Your distance perception obviously is better, but during the day often other things interfere with it, so it is give or take whether night navigation is better than day navigation."

One may question, however, the extent he would have admitted to the Board of Examiners that objects observed during the daytime interfered with his navigation.

29. *Section 1321(f)(1) reads in relevant part,*

"Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any vessel from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred . . . . Such costs shall constitute a maritime lien on such vessel which may be recovered in an action in rem in the district court of the United States for any district within which any vessel may be found. The United States may also bring an action against the owner or operator of such vessel in any court of competent jurisdiction to recover such costs."

act of a "third party." While, in collision cases, any pilot is an agent of the ship, *China,* 1869, 7 Wall. (74 U.S.) 53, 19 L.Ed. 67, a distinction exempting the owners has been drawn in the case of compulsory pilots. *Homer Ramsdell Trans. Co. v. La Compagnie Generale Transatlantique,* 1900, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155; *People of California v. Italian Motorship Ilice,* 9 Cir., 1976, 534 F.2d 836. The owners here, accordingly, urge that even though Captain Dunbar was not a third party as to the ship, he was with respect to them. We do not so construe the statute.

■ There appears to be no specifically significant legislative history, other than a change from a House version based on fault to a Senate version in the direction of strict liability. H.R.Rep. No. 127, 91st Cong., 1st Sess. (1969); S.Rep. No. 351, 91st Cong., 1st Sess. (1969); Conf.Rep. No. 940, 91st Cong., 2d Sess. (1970), but this change itself indicates that unless the exceptions are narrowly construed, the legislative purpose would be largely vitiated. The first three exceptions, "(A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government," (which, individually or collectively, must be "solely" responsible) are manifestly addressed to actions entirely outside the ship, or in the case of actors, to strangers. We read the final exception, "(D) an act or omission of a third party without regard to whether such an act or omission was or was not negligent," correspondingly. To take a simple example, if a vandal opened a ship's valve, this would be an act of a third party. However, if the valve failed because of an act of the installer, the owners should not be permitted to avoid liability by claiming that the installer was a third party because he was an independent contractor rather than an employee. The installer acts for the ship. Equally, though a compulsory pilot might be regarded as an independent contractor, he is at all times subject to the ultimate control of the ship's master. *China,* ante, 74 U.S. at 67–68, 19 L.Ed. 67. The owners lament that they were legally forced to take Captain Dunbar (although it is clear on the evidence that they would have taken a pilot

in any event). So, too, they may have been forced by practical necessities to hire the particular shipyard that installed the defective valve. We agree with the government that they must take the ports they select as they find them.

In providing for liability of the owners, section 1321(f)(1) in no way indicates a desire to recognize any distinction between her owners and the ship. If they were not coextensive, we would have the singular result that if a spill were caused by a state-licensed pilot who was voluntarily taken, the owners must pay their cleanup costs, and the government's, sections 1321(i)(1), 1321(f)(1). If the state, however, in addition to licensing, made pilotage compulsory, and the pilot, as against the owners, were a "third party," the government would have to pay both costs, *id.,* but, at the same time, under section 1321(f)(1) would appear to have a lien against the ship.

■ We can not believe that Congress had any such intent. Nor, under the circumstances, need we consider the government's claim that Captain Dunbar was not, in fact, a compulsory pilot. *The Merrimac,* 1872, 14 Wall. (81 U.S.) 199, 20 L.Ed. 873; Me.Rev.Stat., Tit. 38, § 82 (1964); 1927 Me. Act, Ch. 24, § 10. That such great consequences should turn upon the obligation to pay a pilotage fee, unaccompanied by any obligation to accept the services, would seem to us anomalous, at best. The owners must be held accountable.

No contention is made that the TAMANO herself is not liable for cleanup costs, but whether we have jurisdiction to render judgment raises a possible question. The ship was attached by other plaintiffs in a companion action, but was not attached by the United States, and has left the country. However, claims were filed in the district court on her behalf against the United States, which submitted the subject matter of the government's in rem counterclaim to the court's jurisdiction. *The Gloria,* S.D. N.Y., 1919, 267 F. 929; *The Toledo,* E.D. Mich., 1873, 23 Fed.Cas. 1355, No. 14,077. We see no more reason for litigation to be a

one-way street for a "personified" ship, *see Afran Transport Co. v. S.S. Transcolorado,* 5 Cir., 1972, 468 F.2d 772, 774, than for any other party. *Cf. Adam v. Saenger,* 1938, 303 U.S. 59, 67–68, 58 S.Ct. 454, 82 L.Ed. 649; *Washington-Southern Nav. Co. v. Baltimore & Philadelphia Steamboat Co.,* 1924, 263 U.S. 629, 637, 44 S.Ct. 220, 68 L.Ed. 480.

The Federal Rules of Civil Procedure bolster our conclusion. Rule 1 includes "cases at law or in equity, or in admiralty" within the scope of the rules. Under Rule 13 parties may bring counterclaims against opposing parties. The Supplementary Rules for Certain Admiralty and Maritime Claims (Supplementary Rules) apply to actions in rem. Supplementary Rules A(2). These rules set special provisions to govern amenability to suit of in rem claimants. Supplementary Rule E(8) does permit, in certain circumstances, restricted appearances to defend against in rem claims, but this rule does not give the same privilege to in rem plaintiffs. The Advisory Committee Notes to Supplementary Rule E(8) makes clear that this rule is the drafters' response to the general liberal joinder rules. The narrow defendants' privilege is to protect them from being submitted to an in personam jurisdiction over nonmaritime claims. This policy of fairness does not apply to those bringing claims.

With regard to Captain Dunbar and his employer, Portland Pilots, Inc., the statute, at least arguably, makes no provision for the liability of the ship's agent who caused the spill. Such omission would not help them. We do not believe that the statute was intended to revoke the principles of maritime torts. *Cf. State of California v. S.S. Bournemouth,* C.D.Cal., 1969, 307 F.Supp. 922. Liability of the ship in rem does not release the pilot from the consequences of his own negligence, *People of California v. Italian Motorship Ilice,* 9 Cir., 1976, 534 F.2d 836; *Gray v. Johansson,* 5 Cir., 1961, 287 F.2d 852, *cert. denied,* 368 U.S. 835, 82 S.Ct. 61, 7 L.Ed.2d 36, although we note here that while under the statute the government's actual costs are the measure, on a maritime tort theory the burden would be on the government to show that its costs were reasonable.

The liability findings and judgments of the district court are vacated. The cause is remanded to that court to dismiss the proceedings against the United States and to determine the cleanup costs incurred by the United States as herein defined, and to enter judgments therefor against the TAMANO, her owners, Portland Pilots, Inc., and Captain Dunbar.